IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TYRONE GUINN,
           Petitioner,

      V.

STATE OF DELAWARE,

           Respondents.

ID NO. 07-025

BRIEF and arguments
in separate Memorandum.

DATE: , 2007



RECEIVED
OCT 12 2007
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Judge copy

# TABLE OF CONTENTS

................................ ii

TABLE OF CITATIONS ........................................... 1

NATURE AND STAGE OF PROCEEDINGS ........................ 2

SUMMARY OF ARGUMENT .................................... 3

STATEMENT OF FACTS ..................................

ARGUMENT    (I). THE TRIAL COURT ERRED AS A MATTER
OF LAW WHEN IT DENIED GINN'S
MOTION FOR JUDGMENT OF ACQUITTAL
ON ASSAULT IN A DETENTION FACILITY,
ALLEGED IN COUNT I OF THE
INDICTMENT, AS THE STATE FAILED TO
PRESENT SUFFICIENT EVIDENCE THAT
GUINN INTENDED TO STRIKE OFFICER
SHANNON WITH BODILY FLUID ............ 6

(II). The Sole basis for this Petition, Petitioner
assertion That The Trial Court erroed in
Refusing to grant a hearing on whether
Appellant's / The Defendant was
Denied his Right to "Effective Assis-
tance of Counsel" granteed by the
Six Amendment of the United States
constitution During the stages
of his trial when counsel filed to
supoena and cross-Exiam Def-
endant witness, pursuant to his
"pretrial alibi notice" and Futher
Inerrfective on his appeal by failin to
follow Rule 26 (A)(i)(c)(ii), (A)(B)(ii), (d)(iii)
of the Del, Supr, ct, R, 26, (2007).
.......... 20.

CASE(S):          — CITATIONS —

WhitField V. State of Delaware. Super. Ct,
524 2d B. 16. . . . . . . . . . . . . . . . 7.

STATE V. GATLIN, 129 So. 2d 4 (LA. 1961). . 13.

CONNECTICAT V. CARPENTER, 570 A.2d At
206 (conn. 199). . . . . . . . . . . . . . 13;14

KORNEGAY V. STATE, 596 A.2d 481, 487
(Del. 1991). . . . . . . . . . . . . . . . 14.

MONROE V. STATE 652 A.2d 560 (Del. Supr.
1995). . . . . . . . . . . . . . . . . . . 14.

Burks V. United States, 437 U.S. 1. 11. 18, 98, S. Ct.
2141, 2147, 2150-51, 57 L.ED. 2d 1 (1978). . . . . 15.

CommonwealTh V. Petras, 368 PA Super. 372, 534 A.2d
483 (1987). . . . . . . . . . . . . . . . . 21.

Strickland V. Washington, 466 U.S. 668, 687, 104 S.
Ct. 2052, 2064, 80 L.Ed 674, 695 (1984). . . . , . . 22.

— MORE CASE(S) continue.—

Rules: DEL. St S Ct Rule 26# (2007). . . . . . 23.

          Class D# Felony   11 D.C. S 1254 (C). . . . 16,

## NATURE AND STAGE OF PROCEEDINGS

Tyrone Guinn was charged with three counts of Assault in a Detention Facility. (A-4, 5). Counts I and II involved the throwing of bodily fluid on two correction officers. (*id.*) The third count alleged Guinn caused injury to a correction officer. (*id.*) At a jury trial, upon conclusion of the State's evidence, Guinn moved for a judgment of acquittal on all counts. (A-26, 27). The trial court denied this motion as to Counts I and II holding, specific intent may be inferred from the proximity of the guards to Inmate Hill and the nature of the conduct itself. (A-27). The court also denied the motion as to Count III.

At the conclusion of trial, the jury returned a verdict of "guilty" on Count I and "not guilty" on Count III. They were "hung" on Count II and inadvertently informed the Court of their vote which was in favor of the defendant. The Court entered "not guilty" on that count. (A-2).

On July 1, 2005, Guinn was sentenced on Count I to 8 years at Level V suspended after 3 years for 3 years at Level IV suspended after one year for two years Level 3.

This is Defendant's opening brief in support of his petition

1

## SUMMARY OF ARGUMENT

1.    The trial court erred as a matter of law when it
denied Guinn's Motion for Judgment of Acquittal on Assault
in a Detention Facility, alleged in Count I of the
indictment, as the State failed to present sufficient
evidence that Guinn intended to strike Officer Shannon with
bodily fluid.

2. THE Sole basis For this Petition, Petitioner
assertion That the Trial court erred in
ReFusing to grant a hearing on whether
Appellants / the defendant was Denied his
right to "EFFective assistance of Counsel,"
Granteed BY the Sixth Amendment of the
united states Constitution During the
stages of his trial when Counsel Filed to
Supoena and Cross-Exiam Defendant witness,
Pursuent to his "Pretrial alibi Notice";
and Futher ineffective on his Appeal BY
Failin to Follow Rule 26 (A)(i) (C)(ii), (A)(B)
(iii) of the Del. SuPR, Ct R 26. (2007).

2.

**FACTS**

In the summer of 2004, nineteen-year-old Tyrone Guinn was detained in super-maximum security at Delaware Correctional Center. On June 30th, 2004, while Guinn was in a recreation yard that resembled a "dog kennel cage," (A-7, 20), Officers Shannon and Stevens escorted Inmate Hill past the yard to the shower. (A-8). Shannon was on Inmate Hill's right, closest to the yard, and Stevens was directly behind Shannon. (A-17, 22).

According to Shannon and Stevens, Guinn and Hill "exchanged some words," (A-8), then Shannon "turn[ed] forward, and just that fast [Shannon] heard just like a splash and [he] was drenched [by fluid]." (A-8). Stevens was also hit by the fluid. (A-15). No one saw who threw it, (A-9, 10, 15-17), nor were any of the officers able to positively identify what container was used to "launch" the fluid. (A-10, 15, 21). Since Guinn was the only one in the yard, he was presumed to be the one responsible. (A-8). According to both Stevens and Shannon, the fluid appeared to be a mixture of feces, urine and other substances. (A-8, 13).

Both Shannon and Stevens testified that they had never had any problems with Inmate Guinn. (A-14, 17). Further, they were both new to the tier so they could not testify as

**3.**

to whether there was any "bad blood" between Guinn and Hill. (A-10, 14, 19). Shannon wrote in his incident report and testified at trial that Guinn threw liquid at Inmate Hill, (A-11, 13), and that he [Shannon] was not the intended victim (A-11, 12). Stevens also put in his incident report that the fluid was thrown "toward Inmate Hill." (A-17, 18). But, when asked specifically, Stevens testified he did not know who Guinn was trying to hit. (A-17).

After securing Inmate Hill, officers took Guinn out of the yard and placed him in his cell. While the State alleged Guinn intentionally injured Stevens during a struggle, the jury found him "not guilty" of that charge. (A-2). Sergeant Phillips was the supervising officer and obtained information from the officers. He testified that Stevens told him that Guinn had thrown the fluid at Inmate Hill. (A-22, 23). Later that day, Guinn was placed in isolation for 15 days without a hearing. (A-23, 24).

4.

FACT

(I). ON 5/5/05 COUNSEL SENT SUBPENA(S) TO WITNESSES BY mail (see EXhibit A-2) (SUPERIOR COURT CRIMINAL DOCKET). also COUNSEL SENT DEFENDANT LEGAL mail, IN RESPONS To his COMPLAINT, STATIN : She Had ISSURED his WITNESS With SUBPENA (S) (see - EXhibit **D**\*), But DURN DEFENDANT TRIAL, She FAILED to CROSS-EXAIM THEM BEFOR The COURT AFTNER That Had ARRIVED to TestiFie ON DEFENDANT Behave ON 5/19/05.

(II.) ON 5/20/05 DEFENDANT Was FOUND NOT GUILTY ON (II). COUNTS OF ASSAULT IN DET. FACILITY BUT FOUND GUILTY ON (I.) COUNT. DEFENDANT Was CONVECTED and SENTANCE ON 7/1/05. ON 7/13/05 DEFENDANT COUNSEL Filed a TIMELY NOTICE OF APPEAL TO The SUPREME COURT OF APPEALS, IN LATER WITHOUT NOTICE to the DEF-endant, COUNSEL THEN FILED DEFENDANT APPEAL BRIEF'S ON 8/25/05 and SENT DEFENDANT his COPY OF The BRIEF APPENDIX ON 10/23/05. WITHOUT FOLLOWIN RULE C(i)(A)(B)(iii) (see EXhibit B-1). SO DEFENDANT HAS NO Choice But to FILE A AFFidavit ReQUSTING to PROCeed PRO'SE PURSUANT TO Rule 26 (d)(iii) ON OCT. 18, 2005 BECOUSE OF COUNSEL INEFFECTIVE ASSISTANCE OF COUNSEL, (see EXhibit B-1). And Was COMPLEALY IGNORED BY The SUPREME COURT WITHOUT a NOTICE TO Re-FILE SUCH MOTION BECOUSE There Was NO PROOF OF SERVICE. DEFENDANT COUNSEL THEN FILED APPELLANT REPLY BRIEF ON Dec. 05 2005 aGIAN WITHOUT DE-Fendant NOTICE. COUNSEL VioLated Rule 26\* C(ii) (B)(iii), and ON 2/28/06 DEFENDANT WAS AFFIRMED ON his APPEAL IN The SUPREM COURT. (see EXhibit B-2).

I.   THE TRIAL COURT ERRED AS A MATTER
OF LAW WHEN IT DENIED GUINN'S
MOTION FOR JUDGMENT OF ACQUITTAL
ON ASSAULT IN A DETENTION
FACILITY, ALLEGED IN
COUNT I OF THE INDICTMENT, AS
THE STATE FAILED TO PRESENT
SUFFICIENT EVIDENCE THAT GUINN
INTENDED TO STRIKE OFFICER
SHANNON WITH BODILY FLUID.

### Standard and Scope of Review

Whether any rational trier of fact, viewing the

evidence in the light most favorable to the State, could

find the defendant guilty beyond reasonable doubt. *Davis*

*v. State*, 706 A.2d 523, 524 (Del. 1998); *Monroe v. State*,

652 A.2d 560, 563 (Del. 1995).

### Argument

Concealed with Jar etc.

There were two Type of evidance from which The Jury could find the facts of Defendant(s) case, one was the direct evidance, from Testimony of an eyewitness, the other indirect. Contrary to the State's Contention, no witness in this case could positively **Identify** what Container was used to "Launch" The FLuid That thay Such claim (see A#10,#15,#21) Fact, Neil Steven claim in his testimony that Defendant Had a Container in his hand, But Durn his Testimony he wasin even sure what Type of Jar it was hem salF (A#28). First he indicated it was a Penut Butter Container oR maybe a Juice Container, and when asked what size it was, he still was not even sure (A#15). Then Finally he was not able to present sufficient evidance That iF there was ever a such thing in mr. Guinn hand From the Begianin (A#19) Thats Required By DRE Rule 901 (A); also see (whitField V. State Del. Supr. Ct., 524 2d 13, 16.) (where, state had failed to adequately trace Continous whereabouts of admitted shotgun of Robbery, so as to satisFy Authentication Requirements;) as Far as we Know, he could had Givin Falus untrustworthy testimony, Simply Becouse he had Fecies on hem, and Farther Upset he Never Saw who Struck hem, (A#17) so he TestiFied he Saw mr. Guinn with a Jar etc. in his hand aFther the incident, when Cross-Exaimed By

Defendant counser, was he upset the Fecies
had Land on heu, he Stated:
"not at the time Because he had no idea
it was on heot untiL he Looked afterward
afther the incident (A-18)"
in shannon testimony he clairs it was a small
Penut Butter cup Lewin on the Floor That's givin
to the inmates.(see #A-10).
Then in ② DaviD p. Testimony he claims it was
a Milk carton That was on the Floor at the inc-
ident Scene (A-21) But agian, still theres no such
sufficent evidence to conclue That There was ever
a suchthing in the in the Begiaing. The State
was Requireo to Adequately Trace it's continaus
where arouts of the allegde Jar etc. That each
State witness claimed Defendant had From the
time of the crime or sufficiently Link the Claim
"Jar etc." to Defendant, or agian to the Scene of
the assault, see Rule 901 (A) That Clearly States:

    "The Requirement of Authentication or
    identification as a condition precedent
    to admissibility is Satisfied BY evidance
    Sufficient to Support a finding That the
    matter is question is what it's proponent
    Claims".
The state has failed to Authenticate the claims

8

and establish a "chain of Custody; which in directly establishes The indentity and integrity of the evidence by tracing it's continaus whereabout".

State failed to present circumstantial evidance, That is, The proof of The Fact or Circumstantces from which The existence and non-existantces of other facts That may Reasonably be inferred. nor evidance to show that the alleged Jar etc. Shared a unique trait. nor a Direct Link was established Between mr. Guinn and the allegale weapon such as finger Print evidance. This such claim Does not meet the Requirements under DRE 901 (A) Authentication or indent-ification Rule, "It's Just not there".

## Assault on officer Shannon

None of The state witness saw Mr. Guinn throw The Liquid Fecies *see* (A# Exhibits) In Fact, They were not even sure what Type of Container was used to "Launch" The Fluid, (A#10, 15, 21). Thus no inference can Be drawn with Respect to whether it was thrown Aimlessly, Directed at Inmate hill, Directed at the officers or aimed at some other target.

Example, Durn Mr. Shannon Testimony he Stated he was struck while walkin pass inmate Guinn in Rec yard 2# (A#10 ). Thats also Directly across Mr. Guinn cell 9# up the Hallway (A##8 ) But Later Durn his Testimony he indicated, he was struck across his Back, and all across The Back of his Shart (A-#8). Thus when Cross-exaim By Ms. Van Dyke, could he Discribe the hallway?

"The Floors and Door around 3 or 4 Where Coverd in Fecies" see (A#9 ).

If he had Been Struck on the Rightside in close proximity From Mr. Guinn That was in Rec. yard 2#, Thats Directly across From his cell, where this had acured accordin to Mr. Shannon (A#10 ), he and only The Cell walls, and floors around That Area Cell 9#, would Be coverd in the Fecies, and not Cells 3 or 4, somewhere else Down the Narrol Hallway. The only way Fecies could had Land on

The Cell(s) 3 or 4 "AND" Wall's Down the Hallway, If someone struck hem "Directly From Behind" farther up The Hallway, Bringing there ARM, hand out The Cell Door, or Food Flap the oppissit way he was walkin, makin The Fecies Strike his Back, The Back of his head, walls, and anywhere else Down the hallway, IN cluedin cells 3 & 4 in The Fence, Simply Becouse he was closes to it. (A-#9) Also Durn mr. Shannon Testimony, he indicated hem salf That, he was Struck on his Back, and Back pants Durn Cross-exaimulation BY defendant Counsel (A-# 10.8), and Durn Sgt. Phillips testimony he indicated That when he saw Shannon he simply had Fecies Drippin Down from the Back of his head onto his clothin (A-#20). Then he went on to say:

"Steven had it also, on the Backside of his pants Leg (A—, #20)." But Since Mr. Guinn was the only one in the yard he was presumed to Be The one Respons;ble. When ask Durn exaimnation BY state Attorney; "was there any openins on the cell Tier That The Fecies might would of Came from" (A#9) only officer shannon Respond on the Behave of The Cell Doors without Acknowledin The Fact That: There were also Food Flaps apart of the Cell Where the inmates Recive meals Through, thats also located next to every cell door That Could It.

had Been simply still left open from Dinner or Befor
Rec. That was not properly sucured by an officer
when the assault had acured (see **A-#9** ). Fact,
when officer Testified, nether officer acknowleged,
The concept That There were Food Flaps Next to
each cell, There is a grate Possibilty That it could
had Been simply one still left open either from
Dinner or Befor Rec. or Not properly Sucured BY
an officer when the assault Had acured on officer
Shannon.
For as we know, it could of Been pick open BY an
inmate That was intentionally seekin Revange on the
Both of them.    Farther, white cross-exaimed BY the
same Qustion, mr. Shannon indicated:

> "There were no openings Just Steel iron doors, and
> There's probably like a vent hole at the Bottom of
> the doors, But nothing to Reach out or grab anything".

(**A-#9** ). This is complately **upserb**, the Lower Part of the
Door Does not have any vent holes, and Farther the Lower
Part of The Door is about 4 to 5 inchs, on Both sides of the
Cell doors where You can eazyly stick Your hand through
and Throw anything of that Size out. (see state exhibtt 1ᵗ
and 2ᵗ). exaimple : Durn mr. phillips Testimony he stated:
"There was also a lot of Fecies BY The Door Track
and under the door Track. See (**A-#32** ).

Durn Trial officer Shannon indicated, That inmate
Guinn had exchanged some words with inmate hill,
in he Thouht Thay was havin a Conversation or What-
ever; and as it was walkin he was Struck with
Fecies. (A-#8) But Durn mr. Shannon testimony he
nevered indicated nor mr. Stevens, That The Conver-
sation That Both inmates were havin at the time,
Befor the crime was committed was a verble
Threating argument nor anything of That nature to
supect probable couse towards the Both Had any
Problems with each other whatsoever. (A-#8). as
Far as we Know, They Both Could had Been Sharr-
in a Brief Conversation Durn when the Fecies was
Simply Thown on officer Shannon. Thus Both
officers was new to the Tair so Thay Could not
Testify as to whethere there was any Bad Blood
Beteewn Them two (see A-#14)   also see connecticut
V. Carpenter, 570 A. 2d At 206 (conn. 1990),
Farther; There were no previous encounters Beteewn
either of the officers and Guinn (A-#14 ) State
V. Gatlin, 129 So. 2d 4 (LA. 1961), Thus There was
no evidance of motive to hit Shannon or of a
Pattern of adverse behavior toward the officers
( see  A-#14-A-#11).

Judgement of Acquittal

Finally, The Jury's irrational and inconsistent
Verdicts amplify the Trial Court Judge error
in denying Guinn motion. Guinn was found "guilty"
of Count I, Intentionally striking officer Shannon
with Bodily fluid. (A-2). However, the Jury was
"hung" on Count II. which alleged Guinn intended
to strike officer stevens with bodily fluid. (A-2).
The Jury inadvertently Revealed to the Court their Vote
on count II, which Favored the defendant, Thus,
The court entered a verdict of "no guilty" on that count
without objection by the State. (A-2). The Verdicts on
Counts I and II demonstrate confusion on the part
of The Jurors with Respect to applying the State's insu-
fficient evidance to the Law of Specific intent.
Specific intent was not supported in this case, Thus
it was "error to submit it to The Jury as if the ev-
idance Justified the Determination of the presence
of That element." (see Connecticut V. Carpenter 570
A. 2d 203, 206 (conn.1990). Therefore, a Judgement
of acquittal was Required to Prevent an irrational
and inconsistant verdict. (see Kornegay v. State, 596
A. 2d 481, 487 (Del. 1991). assault in a Detention Facility,
as alleged in Count I. of the indictment is Defined
in; 11 D.C. § 1254 (C). see also monroe V. State 652 A.
2d 560 (DEL. Supr. 1995). (When appellate court overturns
Jury's guilty verdict on insufficienly of evidence
grounds, Double Jeopardy Clause or United State

and state Constitution bar Retrial.")( Burks V.
United States, 437 US, 1. 11. 18, 98 S. Ct. 2141, 2147,
2150-51, 57 L. ED. 2d 1 (1978).
The State Failed to prove every element of Cant
I, "Assault In a Detention Facility beyond Reasonab.
doubt, see IN Re Winship, 397 US, 358, 364 1970)
Because of The State's Failure, The Trial Court Should
have Granted Guinn's motion For Judgment of
acquittal. Therefore, Guinns Conviction and
Sentance Should Be Reversed.

(BRIFE / opining )

ordinarily, intent is a question for the trier
of Fact. However, specific intent was not support-
ed in this case, Thus it was "error to submit it
to the Jury as if the evidence justified the
Determination or the presence of That element".
Therefore, a Judgement of acquittal was
Required to prevent an "IRRATIONAL and
INCONSISTENT Verdicts".

Assault in a Detention Facility as alleged in Count I*
of the indictment, is defined as Follow; "Any Person
who, being Confined in a detention facility, intent-
ionally Strikes with Urine, Feces or other bodily
Fluid a Correctional Officer or other state employee
of a Detention Facility acting in the lawful
preformance of Duties or any other person at a
detention Facility or other place having Custody of
Such Person, other Then another person Confined at
a Detention Facility Shall be guilty of a Class I
Felony" 11 D.c. § 1254 (c). The State originally Sought
to Convict Guinn on Count I under the Theory of
Transferred intent, Relying on evidence That Guinn
intended to Strike inmate hill but hit officer
Shannon instead. (A*26,*27). However, The Court Ruled
That it was "pretty Clear" That Transferred intent
Can not "Escalate and add a new element to a
Charge" of offensive Touching to prove assault

in a Detention Facility.(A-25). Thus, The State was Required to establish "an intentional Striking of a Correctional officer see e.g., Kornegay, 896 A.2d 481; notwithstanding the Courts finding that Assault in a Detention Facility is a specific intent offense, (A-25), The Trial Court denied Quinn motion (A-27). all Testimony Presented in the State's case was Consistant with Finding no intent to hit a Correctional officer there was "no evidance or any kind Which would show, or Support the Conclusion of a Reasonable mind That [he] harbored the Requisite Specific Intent [to hit officer Shannon]

- SEPARATE MEMORANDUM -
BRIEF / ARGUMENT

It's BEEN Well SETTLED:

Federal Courts may not Consider the merits or procedurally defaulted claims unless The petitioner Demonstrate either cause For the procedural default and actual Prejudice resulting ThereFrom, or that a Fundamental Miscarriage of Justice will result if the court does not review The claim. Mc Candless v. Vaughn, 172 F. 3d 255, 260 (3d cir. 1999); Coleman v. Thompson, 501 US. 722, 750-51 (1999); caswell v. Ryan, 953 F. 2d 853, 861-62 (3d cir. 1992).

To demonstrate cause For a procedural Default, a Petitioner must show That "some objective Fator external to the deFense impeded counsel's efforts to Comply with the State's Procedural rule." murry v. carrier, 477 us. 478, 488 (1986). A petitioner can demonstrate actual prejudice by Showing "not merely That The errors at... Trial created a possibility of Prejudice, but That They worked to his actual and Substantial disadvantage, inFecting his entire Trial with error of Constitutional dimensions".

Alternatively, a Federal Court may excuse a procedural default iF The petitioner demonstrate's That Failure to review The Claim will result in a Fundamental miscarriage of Justice. Edwards v. carpenter, 529 us. 446, 451 (2000); Wenger V. Frank, 266 F. 3d 218, 224 (3d cir. 2001). in order to demonstrate a "Constitutional Violation has Probably resulted in the Conviction of one who is actual

innocence means Factual innocence, not Legal
insufficiency. Bousley v. United States, 523 U.S. 614,
623 (1998). A petitioner establishes actual innocence
by Proving That no reasonable Juror would have voted
to Find him guilty beyond a reasonable doubt.
Sweger V. Chesney 294 F.3d 506, 522-24 (3dCir,2002).

19 #

II. The sole basis FoR this Petition, Petitioner
assertion That The TRial CouRt eRRed IN Refusing
To GRaNt a heaRiNG oN whetheR APPellaNts / the
DeFeNdaNt was DeNied his RiGht to "EFFEctive
ASSiStANce oF couNsel", GRaNteed BY the Sixth AmeN-
dment oF the uNited StAtes CoNstitutioN DuRNiNG
The Stages oF his TRial wheN couNsel FiLed to SubPeNA
aNd cRoSS-ExiAM DeFeNdaNt WitNess, PuRSuaNt to
His    "PReTRial alibi Notice, aNd FuRtheR
INEFFective oN his APPeal BY FailiN to FoLLow
Rule 26(NX0(c)(i), (A)(B)(iii), (d)(iii) oF the DeL. SupR.
Ct R 26. (2007).

ZO

ARGUMENT

21.#

It IS well settled IN,

To establish INEFFectiveness For Failure to Call Witness, defendant must establish That: (1) witness existed; 2) witness was Avaible; (3.) Counsel was INFoRMED of existence of witness oR Counsel should otherwish have know of him; (4). witness was pre pared to Cooperate and Testify FoR defendant at TRiaL; and (5.) obsence of TestiMoNY preJudiced Defendant so as to deNY him FaiR TRiaL. US,C,A const. (See also CommonwealTh v. Petras, 368 pa. Super. 372, 534 A.2d 483 (1987).

IN This Case BeFoR The CouRT IS, Counsel Was INFoRMED oF Defendant existence of witness ON MaRch 16. 2005 and Had his witness INTeRViewed by heR INVestigatoR; IN FACT, Counsel also Indicted That She Had Issued The appropRate suppoenas IN heR RESPoNSE LetteR to Defendant Complaint CoRRes ponse LetteR (see exhibit D#). FaRTheR, CounseL Had Notice oF DeFendant RXisted witnesses, She Suppoened witnesses:

(I) DEVAN MiLL's SBI: 00192524
(II), eRNest hiLL  SBI: 350002

by Mail, also ON 5/5/05 (see A-2, SupeRioR CouRt CRiMiNaL Docket) oN 5/19/05 witNesses (I) and (II) was pRep- aRed to CoopeRate and Testify FoR defendant at TRiaL. Defendant CounseL LateR Indicated to defendant DuRN The pRoceeding oF TRiaL That his witNesses will Be Called and CRoss-RXiaM ON 5/21/05, But Thay weRe Not. Called and CRoss-RXiaM oN That Date to TestiFie oN

And Thus, Confirm The defense's Claim that he did Not Throw Such Fecies "Intentionally" on the Alleged officer (s) In his Indictment'; Finally Provide a plausible version of Contractual Transaction Between The Crime and Victum and the Aftmer math. Counsel Failed also To Supena Witness (III). Wasley Greene SBI' 275884, and Cross-exaim him as well. Under the Strickland-Fritz test, defendant Must prove the Following two-Prongs'

First, The defendant must Show That Counsel performance was Deficient. This Requires Showing That Counsel Made errors so serious That Counsel was Not Functioning as The "counsel" Guaranteed The defendant by The Sixth Amendment, second, The defendant must Show That The deficient performance pre-Judiced The defense, This Requires showing That Counsel's err's were so serious as To deprive The defendant of a Fair Trial, a Trial whose Result is Reliable (see Strickland V. washington, 466 us, 668, 687, 104 s, Ct, 2052, 2064, 80 Led 674, 693 (1984); (state V. Fritz, 105 N.J. 42, 58, 519 A. 2d 336 1987). If Counsel Had Subpena and Cross-exaim All his witnesses, The Trial In his Conviction Might would Had Been Different Because of State Lack of Evidence That was already Insufficient, To have Defendant witness Cross-exaim would had very much likely have affected The outcome of The Case as It directly Contradicts the Victims testimony, making Defendant Defense Stronger simply Because, "again," his witnessess

- SEE        "Reversed Side"

22*

Could have provide The sworn testimony of what happen
on the Nite officer Shannon was assaulted By Fecies
see (STATE V. PETROZELLI, 796 A. 2d 927 May 14, 2002)
where "Defendant was entitled to an evidentiary
hearin on his Claim of ineffective assistance of Trial
Counsel for Counsel Failure to call alleged exculpatory
witnesses in trial in which defendant was charged with
Theft by Failure to Make Required disposition of
Property; witnesses, who were either friends, associates,
or Relatives of Defendant, Provided a plausible Ver-
Sion of Contractual Transaction Between defendant
and Victum, and the afthermath". also see (Commonwealth
V. Stanley, 534 Pa. 297, 300, 632 A.2d 871, 872 (1993).

even afther Counsel for Defendant acted with pre-Judice,
so Grievous That Counsel performance Fell below an
obJTective standard of reasonableness, Counsel Then took
It upon her salf to File Defendant Appeal on 8-25-2005
in then Later sent him his appeal copy already Filed on
9-23-2005 (see Exhib. B1). Thus even when defendant Filed a
Motion for pro'se Pursue to Rule 26(d)(iii) (see exhibit B-1)
Defendant Counsel Filed That appeal to the supreme
Court one Full Month when she was suppost to advise
The Client of these Rights befor Filen it without
his notice (see exhibit B-1-2, of Suprme Court). also see
Rule DE st s. ct. R. 26*A-B*, 2007 That Clearly States:
  (A) Copy to Client. "supplied The Client with a
  Copy of the motion And the Brief (B) advise to the

Client, That the client could state in a writing, de-
livered to The attorney within 30 days, any
point That The Client wanted the court to Consider,
And That such a writing would be included in
The Brief. such Statement by the Attorney shall state
The date on which the Attorney delivered a copy of
The motion and brief to the Client, and whether
or not writing was Recived in Response thereto".
Nowhere in Defendant criminal court Docket, it says:
"She gave such statement," and it stated the date on
Which She Deliverd a copy of the Brief to the Defendant
And whether a copy/writing was Recived in Response t
See exhibit A-1-2, B-1-2. Defendant counsel was ineff-
ective, and Knew what She was Doin, after the
Defendant had Filed a pro'se motion pursuant to DE.
St s. Ct Rule (d)iii) see (exhibit B-2). of the Reply Brief. and
exhibit *B-#. If Counsel would had Follow the Rule 26*(B). and
Had notice client of what she was doing, There would in
have Been any of the above Deficients, or Affirmed
Appeal in Supreme court, if She would had provided
Client With a copy of the Brief Befor Filing it, it would
had impacted The outcome also on Defendant "agian"
Appeal, Becouse if Client Did not Desire that ground She
had placedown to argve, Client would of Simply had a
right to File pro'se on 2/25/2006 defendant Appeal
Was affirmed in the Supreme curt, and his mandate
Returned with a Denied hearing on Bench see (B-D and (B-3)

24*

Petitioner demonstrate That Failure to
Consider the Claims will result in the Fundamental
Miscarriage of Justice simply Because:

The Sixth Amendment right to Counsel exists and
is Needed, in order to protect the Fundamental right
to a fair trial, and the constitation guarantees a fair
Trial Through the Due process clauses, Thus the right
to Counsel plays a crucial role in the adversarial
System embodied in the Six Amendment, Since access
to counsels Skill and knowledge is necessary to
accord defendants the "ample opportunity to Meet the
Case of the prosecution" to which They are entitled,
Adams V. united States ex rel. MC. Cann, 317 US, 269,
275, 276, 63 S. Ct. 236, 240, 87 L.Ed. 268 (1942);
See powell V. Alabama, supra, 267 U.S. at 68-69, 53,
S. Ct. 63-64

"IN all Criminal prosecutions, the accused Shall
enjoy the Right to a Speedy and district wherein the
Crime Shall have been committed by Law, and to be
informed of the Nature and cause of the accsation,
to be confronted with the witnesses against him; to
have Compulsory Process for obtaining witnesses in
his favor, and to have the assistance of Counsel for
his defense". USCA, const. AMend. 6; Petitioner also
Contends that the State courts Should have excused
his procedural default "in the interest of Justice" and

25.

that their Failure to do so constitutes a
"Substantial miscarriage or Justice".

## CONCLUSION

For the reasons and upon the authorities cited herein, the undersigned respectfully submits that the Defendant's convictions and sentence must be reversed.

Respectfully submitted,

TYRONE   GUINN   SBI : 375731

Q6.

— Exhibit(s) —

## TABLE OF CONTENTS

Page

COURT DOCKET.................................................A-1

INDICTMENT..................................................A-4

MAY 19, 2005
  Testimony of Officer Shannon ....................... A-7

  Testimony of Officer Stevens ....................... A-14

  Tsetimony of Officer Phillips ...................... A-20

MAY 20, 2005
  Argument on Motion for Judgment of Acquittal......... A-25

JULY 1, 2005
  Sentencing Order.................................... C-1

MAY 19, 2005
  Testimony of Officer Stevens............. A-28-32

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    1
                        ( as of  09/22/2005 )
```

State of Delaware v.  TYRONE L GUINN                          DOB: 11/12/1984
State's Atty: CARI A VAN DYKE , Esq.        AKA: TYRONE H GUINN
Defense Atty: NICOLE M WALKER , Esq.             TYRONE H GUINN


Assigned Judge:

Charges:

| Count | DUC# | Crim.Action# | Description | Dispo. | Dispo. Date |
|-------|------|--------------|-------------|--------|-------------|
| 001 | 0411013992 | IN04111483 | ASSLT DET FACIL | TG | 05/20/2005 |
| 002 | 0411013992 | IN04111484 | ASSLT DET FACIL | TNG | 05/20/2005 |
| 003 | 0411013992 | IN04111485 | ASSLT DET FACIL | TNG | 05/20/2005 |

```
       Event
No.    Date          Event                              Judge
-----------------------------------------------------------------------------
1     11/23/2004
        CASE ACCEPTED IN SUPERIOR COURT.
        ARREST DATE: 11/17/2004
        PRELIMINARY HEARING DATE: 112204
        BAIL:   SECURED BAIL-HELD               6,000.00 100%
        NO CONDITION
2     11/29/2004
        INDICTMENT, TRUE BILL FILED.NO 117
        SCHEDULED FOR CASE REVIEW AND ARRAIGNMENT 12/20/04 AT 9:00
3     12/06/2004
        SUMMONS MAILED.

        NOTICE OF SERVICE - DISCOVERY RESPONSE.
4     12/20/2004
        ARRAIGNMENT CALENDAR - 10-C FILED_BY MCDONALD
      12/20/2004                              BABIARZ JOHN E. JR.
        CASE REVIEW & ARRAIGNMENT CALENDAR: SET FOR FINAL CASE REVIEW.
        DATE: 1/18/05 @ 9
      01/18/2005                              ABLEMAN PEGGY L.
        FINAL CASE REVIEW:  NO PLEA/SET FOR TRIAL 5/19/05
      01/18/2005                              ABLEMAN PEGGY L.
        ORDER SCHEDULING TRIAL FILED.
        TRIAL DATE: 5/19/05
        CASE CATEGORY: #2
        ASSIGNED JUDGE (CATEGORY 1 CASES ONLY):
        UNLESS THE COURT IS ADVISED WITHIN 2 WEEKS OF THE UNAVAILABILITY
        OF NECESSARY WITNESSES, THE COURT WILL CONSIDER THE MATTER READY
        FOR TRIAL.  ABSENT EXCEPTIONAL CIRCUMSTANCES, RESCHEDULING OR
        CONTINUANCE REQUESTS WILL BE DENIED.
6     04/14/2005
        DEFENDANT'S LETTER FILED.
```

SUPERIOR COURT CRIMINAL DOCKET                    Page      2
( as of   09/22/2005 )

State of Delaware v.   TYRONE L GUINN                          DOB: 11/12/1984
State's Atty: CARI A VAN DYKE , Esq.        AKA: TYRONE H GUINN
Defense Atty: NICOLE M WALKER , Esq.             TYRONE H GUINN

|  | Event | | |
|---|---|---|---|
| No. | Date | Event | Judge |

```
              TO: LAWRENCE SULLIVAN
              DEFENDANT WANTS A NEW ATTORNEY ASSIGNED TO CASE.
    7    04/26/2005
              SUBPOENA(S) MAILED.
    8    05/05/2005
              STATE'S WITNESS SUBPOENA ISSUED.
    9    05/11/2005
              TRANSCRIPT FILED.
              PRELIMINARY HEARING-NOVEMBER 22,2004
              BEFORE COMM.MARY MCDONOUGH
         05/19/2005                            JOHNSTON MARY MILLER
              TRIAL CALENDAR- WENT TO TRIAL JURY
    10   05/20/2005                            JOHNSTON MARY MILLER
              CHARGE TO THE JURY FILED.
    11   05/20/2005                            JOHNSTON MARY MILLER
              JURY TRIAL HELD BEFORE JUDGE JOHNSTON 5/19-5/20/05.
              ON 5/20/05, THE DEFENSE MADE A MOTION FOR A JUDGEMENT OF ACQUITTAL
              ON ALL 3 COUNTS. THE MOTION WAS DENIED.
              THE JURY BEGAN DELIBERATIONS ON 5/20/05. THE JURY RETURNED ON 5/20/05
              WITH VERDICTS OF: ASSAULT IN A DETENTION FACILITY (1483) GUILTY;
              ASSAULT IN A DETENTION FACILITY (1484) NOT GUILTY- JUDGE JOHNSTON
              DECLARED THIS CHARGE NOT GUILTY; THE JURY COULD NOT AGREE ON A VERDICT
              ON THIS CHARGE; ASSAULT IN A DETENTION FACILITY (1485) NOT GUILTY.
              A FULL PRE-SENTENCE INVESTIGATION IS ORDERED. SENTENCING WILL BE
              ON JULY 1, 2005 @ 9:30.
              STATE'S ATTORNEY: CARI VAN DYKE
              DEFENSE ATTORNEY: NICOLE WALKER
              COURT REPORTER(S): PATRICIA GANCI/JEANNE CAHILL
              COURT CLERK(S): MARIE CARUSO/JENNIFER HOUSTON/ANGELA HAIRSTON/
              ANTHONY IANNELLI
              EVIDENCE IS STORED IN THE VAULT
         07/01/2005                            JOHNSTON MARY MILLER
              SENTENCING CALENDAR: DEFENDANT SENTENCED.
    12   07/01/2005                            JOHNSTON MARY MILLER
              SENTENCE: ASOP ORDER SIGNED AND FILED 7/14/05
    13   07/19/2005
              LETTER FROM SUPREME COURT TO KATHLEEN FELDMAN, COURT REPORTER
              RE: A NOTICE OF APPEAL WAS FILED ON JULY 13, 2005.
              THE TRANSCRIPT IS DUE AUGUST 22, 2005.
              313, 2005
    14   08/01/2005
              LETTER FROM SUPREME COURT TO COUNSELOR NICOLE WALKER, ESQ.
```

```
                    SUPERIOR COURT CRIMINAL DOCKET          Page    3
                         ( as of  09/22/2005 )
```

```
  ate of Delaware v.  TYRONE L GUINN                        DOB: 11/12/1984
State's Atty: CARI A VAN DYKE , Esq.       AKA: TYRONE H GUINN
Defense Atty: NICOLE M WALKER , Esq.            TYRONE H GUINN
```

```
      Event
No.   Date        Event                           Judge
-----------------------------------------------------------------------------
      RE: THE NOTICE OF APPEAL FILED ON JULY 13, 2005. DOES NOT
      COMPLY WITH SUPREME COURT RULE 7(C)(9). JUDGE JOHNSTON'S
      JULY 1ST SENTENCING ORDER MUST BE ATTACHED TO THE APPEAL.
15    08/03/2005
      TRANSCRIPT FILED.
      TRIAL-MAY 20,2005
      BEFORE JUDGE JOHNSTON AND JURY
      RPR-JEANNE CAHILL
16    08/17/2005
      TRANSCRIPT FILED.
      TRIAL-MAY 19,2005
      BEFORE JUDGE JOHNSTON AND JURY
      P.GANNI,RPR
17    08/17/2005
      TRANSCRIPT FILED.
      SENTENCING-JULY 1,2005
      BEFORE JUDGE JOHNSTON
      P.GANNI,RPR
      08/23/2005
      RECORDS SENT TO SUPREME COURT.
      313, 2005
18    08/29/2005
      ............ ..... ..... .............. ......
      313, 2005
```

```
              *** END OF DOCKET LISTING AS OF  09/22/2005 ***
                    PRINTED BY: JDEFDAB
```

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| STATE OF DELAWARE | ) |
| | ) |
| v. | )    I.D. No. 0411013992 |
| | ) |
| TYRONE GUINN | ) |
| | ) |
| Defendant. | ) |

The Grand Jury charges Tyrone Guinn with the following offenses:

### COUNT I. A FELONY      IN # 04-11-1483

**ASSAULT IN A DETENTION FACILITY**, in violation of Title 11, Section 1254 of the Delaware code of 1974, as amended.

**TYRONE GUINN**, on or about the 30th day of June, 2004, in the County of New Castle, State of Delaware, while being confined in a detention facility, did intentionally strike Officer Shannon with urine, feces, or other bodily fluid, a guard at the facility who was acting in the lawful performance of his duties.

### COUNT II. A FELONY      IN # 04-11-1484

**ASSAULT IN A DETENTION FACILITY** in violation of Title 11, Section 1254 of the Delaware Code of 1974, as amended.

6

**TYRONE GUINN**, on or about the 30th day of June, 2004, in the County of New Castle, State of Delaware, while being confined in a detention facility, did intentionally strike Officer Stevens with urine, feces, or other bodily fluid, a guard at the facility who was acting in the lawful performance of his duties.

### COUNT III. A FELONY      IN 3 04-11-1485

**ASSAULT IN A DETENTION FACILITY**, in violation fo Title 11, Section 1254 of the Delaware Code of 1974, as amended.

**TYRONE GUINN**, on or about the 30th day of June, 2004, in the County of New Castle, State of Delaware, while being confined in a detention facility, did intentionally cause physical injury to Neil Stevens, a correctional officer acting in the lawful performance of his duties.

7

**1**

```
1    IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

2         IN AND FOR NEW CASTLE COUNTY

3
     STATE OF DELAWARE,
4
          Plaintiff,
5
     v.              IN04111483
6
     TYRONE L. GUINN,
7
          Defendant.
8

9
     BEFORE:  HONORABLE MARY M. JOHNSTON, J.
10            and jury

11

12   APPEARANCES:

13        CARI VAN DYKE, ESQ.
          DEPARTMENT OF JUSTICE
14        for the State

15        NICOLE M. WALKER, ESQ.
          OFFICE OF THE PUBLIC DEFENDER
16        for the Defendant

17

18
                TRIAL TRANSCRIPT
19              MAY 19, 2005

20

21
              PATRICIA L. GANCI, RPR, CRR
22        SUPERIOR COURT OFFICIAL REPORTERS
          500 N. King Street, Suite 2609, 2nd Floor
23           Wilmington, Delaware  19801-3725
                   (302) 255-0653
```

**2**

```
1                    I N D E X

2    TESTIMONY OF MALCOLM SHANNON
       Direct Examination by Ms. Van Dyke.........12
3      Cross-Examination by Ms. Walker............37
       Redirect Examination by Ms. Van Dyke.......49
4      Cross-Examination by Ms. Walker............52
       Redirect Examination by Ms. Van Dyke.......58
5
     TESTIMONY OF NEIL STEVENS
6      Direct Examination by Ms. Van Dyke.........59
       Cross-Examination by Ms. Walker............79
7.     Redirect Examination by Ms. Van Dyke.......94
       Cross-Examination by Ms. Walker............96
8      Redirect Examination by Ms. Van Dyke.......97

9    TESTIMONY OF DAVID PHILLIPS
       Direct Examination by Ms. Van Dyke.........98
10     Cross-Examination by Ms. Walker...........111
       Redirect Examination by Ms. Van Dyke......122
11     Cross-Examination by Ms. Walker...........124

12              - - - - -

13              May 19, 2005
                Courtroom No. 8E
14              11:45 a.m.

15   PRESENT:

16        As noted.

17              - - - - -

18        (Whereupon, jury enters the room at 1:51 p.m.)
19        THE COURT:  Good afternoon, ladies and
20   gentlemen.
21        Ms. Van Dyke, are you ready to proceed?
22        MS. VAN DYKE:  Yes, Your Honor.  May it please
23   the Court.
```

**3**

RECEIVED AUG 1 8 2005

```
1         Good afternoon, ladies and gentlemen.  My name
2    is Cari Van Dyke.  I'm a Deputy Attorney General.  I
3    represent the people of the State of Delaware.  This is
4    my time now to give you an opening statement, which is
5    basically an introduction to the case, and I'd like to
6    start by telling you that individuals who commit crimes
7    and are later convicted of those crimes oftentimes go to
8    prison.  They go to prison because they have chosen to
9    not abide by the law.  Even when the individuals are
10   incarcerated for those criminal offenses, they choose to
11   still continue to not abide by the law.  So, yes, when
12   people are incarcerated, they do commit crimes in prison
13   and the State prosecutes them just as if it had happened
14   on the city streets.
15        The defendant in this case is Tyrone Guinn.  He
16   is sitting at the far table next to his attorney.  On
17   June 30th, 2004, Tyrone Guinn was a sentenced inmate at
18   the Delaware Correctional Center in Smyrna, Delaware.
19   He was -- as a sentenced inmate, he was secured in
20   what's called, what we refer to as the SHU.  It's the
21   Secured Housing Unit.  It's a super max detention
22   facility.
23        .  While he's at this facility, there are
```

**4**

```
1    strict guidelines.  As in any prison, there are strict
2    rules that must be followed not only by the inmates, but
3    by the correctional officers.  And in this super maximum
4    security prison, there are rules that inmates don't have
5    contact with other inmates.  They are housed
6    individually.  They eat in their cells.  They shower
7    individually.  They go to the recreation yard
8    individually, and they do not have contact with one
9    another.  At all times when they leave their cell or if
10   they leave the recreation yard, they are escorted by two
11   guards which are correctional officers.
12        On June 30th, 2004, Tyrone Guinn at some point
13   was secured in what's called an interior recreation
14   yard.  It's not outside.  It's inside the building, but
15   it's a yard in which he can exercise, walk around.  He's
16   not cuffed.  He uses that yard.  And while he's secured
17   in there alone, not with any inmates, Officer Shannon,
18   Malcolm Shannon, and Officer Neil Stevens are escorting
19   another inmate.  They are escorting this inmate from his
20   cell to the shower area.  And it's two guards, and this
21   inmate is also cuffed behind his back as he's walking.
22        And as they're walking, they're walking down a
23   very narrow hall, probably about six feet in width.  And
```

17

1    A.    As soon as I come in, first thing, probably be
2    briefed by the officers that were there previously, just
3    what went on during the course of the day, anything, you
4    know, just a heads-up for everything. Basically, after
5    that, get a count for all the inmates, make sure
6    everybody's there. From there we go onto feeding. That
7    takes about a half an hour out of our time, 45 minutes
8    out of the time. Then after that, that's when we start
9    recreation, and usually we do about six cells at a time.
10   And between that, that takes about an hour and 45
11   minutes, two hours to go ahead and do two tiers at the
12   same time. And we bring them in for showers, phone
13   calls, if there is something going on, and basically
14   after that, it's just keeping up on our area checks.
15       Q.    Okay. Thank you.
16            How are the tiers laid out? You said you have
17   two tiers that you had to supervise on the 30th. Can
18   you explain, are those tiers one on the bottom level,
19   one on the top level?
20       A.    Yes. Well, each tier has two levels that has
21   12 cells on each level. And there's only one inmate to
22   each cell.
23       Q.    Okay. If you don't mind, to assist the jury,

18

1    with permission of the Court, I'd like to have the
2    officer step down and possibly draw a sketch.
3            MS. WALKER:    No objection.
4            THE COURT:    All right.
5    BY MS. VAN DYKE:
6        Q.    If you don't mind drawing a sketch of the tier
7    layout that you were in charge of on that night, on the
8    30th.
9        A.    This is just basically just a bottom level.
10   There's another level that's just like this.
11       Q.    This would be the bottom level?
12       A.    This is the bottom level tier. When you come
13   in through the sliders, first thing is you have -- cells
14   1 through 10 and 11 to 12 are, like, facing towards the
15   security yard the inmates, they go and have their
16   recreation in. That's fenced in all around them.
17       Q.    How many of those are there?
18       A.    It's two yards on the inside.
19       Q.    Two yards?
20       A.    And it's three on the outside. But most time
21   they only use two on the outside, but for the inside
22   there's only two.

19

1        A.    There's two.
2        Q.    Three on the outside?
3        A.    Right.
4        Q.    And then you have 12 inmate cells?
5        A.    Right, for the bottom level. There's 12 for
6    the top. It's the same format.
7        Q.    Okay. And what is the -- it says Yard 2 off to
8    the left. That is the second yard?
9        A.    Yeah, that's the second yard. That's how we
10   have to label it.
11       Q.    That's all right. No, you're doing very well.
12   Where is Tyrone -- do you know Tyrone Guinn?
13       A.    Yes.
14       Q.    Could you please tell the Court where his cell
15   is located?
16       A.    His cell at the time was located here, at Cell
17   9.
18       Q.    Cell 9. Okay. Why don't you go ahead back and
19   take a seat?
20            Okay. Now, after you drew that diagram, could
21   you please tell the jury what procedures you must follow
22   at all times when moving inmates out of their cell?
23       A.    Removing a SHU inmate from the cell, it must be

20

1    two officers present and the inmate must be cuffed from
2    behind at all times. And when leaving the tier, they
3    must be shackled for rec purposes -- recreational
4    purposes. When they go to outside yards, whatever,
5    shackles aren't really needed. But usually it's just
6    being handcuffed from behind, and then you're allowed to
7    bring out just a laundry bag or just clothing for
8    whatever they want to put on when they come out the
9    shower. And that's all.
10       Q.    Okay. Now, is that procedure followed at all
11   times when they leave their cell?
12       A.    Yes.
13       Q.    And do you have -- what is a normal uniform for
14   you? Is that what you have on or a little different?
15       A.    No, we have kind of a little different uniform.
16   It's an old maximum uniform, but it becomes just another
17   substitute for this, you know, just for comfortability
18   reasons.
19       Q.    So you don't have all of the shield on?
20       A.    No, the shield is just a patch and it's
21   basically BTUs, like Army BTUs.
22       Q.    So it's more comfortable clothing for you?

25

1    Q.    What would Inmate Guinn be taking to the
2    recreation yard?
3        A.    Well, at the time I remember he just took the
4    usual: his boxers, shower shoes, his slippers, and he
5    already had his jumper and sweat suit on.
6        Q.    And he's cuffed at this point going to the
7    recreation yard?
8        A.    Yes.
9        Q.    And are you being assisted by anyone?
10       A.    Yes, Officer Stevens.
11       Q.    Okay. And how long do they normal stay in
12    recreation?
13       A.    45 minutes to an hour.
14       Q.    Okay. And you know why you're here today,
15    right?
16       A.    Yes.
17       Q.    Could you please describe to the jury what you
18    were doing when that incident took place?
19       A.    Well, after I placed Mr. Guinn in the yard, I
20    proceeded to the next cell over to get the next inmate
21    out. And that was Inmate Ernest Hill.
22       Q.    Okay. Would that be cell No. 10?
23       A.    Cell No. 10.

26

1        Q.    Okay. And what was your intention with Ernest
2    Hill?
3        A.    Well, he didn't want -- he didn't want to go
4    out for recreation. He wanted to take a shower. So I
5    was taking him to the showers.
6        Q.    And where are the showers located on that
7    diagram if you would just kind of describe?
8        A.    Right before cell 1.
9        Q.    So all the way down at the other end of the
10    hall?
11       A.    Yes.
12       Q.    And this hallway, could you describe the
13    approximate width of this hallway, what it's comprised
14    of?
15       A.    Well, the yard takes up most of the room. So
16    it's pretty -- it's not too narrow, but it's about --
17    it's -- as far from the beginning of this building right
18    here to where the back row is, there's about that much
19    walking distance from it between.
20       Q.    Between the recreation yard and the cell?
21       A.    Yes.
22       Q.    That's how much space?
23       A.    Yeah, that's how much space it is.

27

1        Q.    Okay. Now, you said that Inmate Ernest Hill
2    wanted to get a shower?
3        A.    Yes.
4        Q.    And where was Tyrone Guinn at that time?
5        A.    He was in Yard 2.
6        Q.    Okay. Yard 2. And what did you do with Ernest
7    Hill?
8        A.    Well, after he was cuffed and he grabbed his
9    belongings, we go up and went ahead and we just walked
10    down to the showers. And I was walking next to him.
11    And he had exchanged some words with Inmate Guinn and,
12    you know, a typical, you know, just thought they were
13    having conversation or whatever. And as we were
14    walking, I just -- I turnt forward, and just that fast I
15    heard just like a splash and I was drenched. And I
16    looked around, and I was covered in feces.
17       Q.    Okay.
18       A.    And it smelled -- it smelt of urine, and it was
19    covered all over the side of my face and my hair and on
20    my clothes.
21       Q.    How certain were you that it was feces and
22    urine?
23       A.    I could tell by the smell and the color was

28

1    there, and it was just disgusting.
2        Q.    And where were you struck?
3        A.    Across the side of my face and my hair, my
4    back, all across the back of my shirt, my pants.
5        Q.    Okay. What side?
6        A.    All, it was across my whole right side.
7        Q.    Your whole right side?
8        A.    Yes.
9        Q.    And what was directly to your right side as
10    you're walking Ernest Hill out to the shower?
11       A.    Yard 2.
12       Q.    Yard 2. Okay. And was there anyone else in
13    Yard 2 other than Tyrone Guinn at that time?
14       A.    No, there was only one person allowed in the
15    yard.
16       Q.    Okay. Now, were the other inmates in the cells
17    along that corridor, that hallway?
18       A.    Yes.
19       Q.    Okay. Did anything strike you from the left
20    side?
21       A.    No.
22       Q.    Okay. And could you describe to the jury what
23    the yard is comprised of? Is it fenced? Is it --

29

1    A.   It's completely fenced, and towards the back of

2    the yard is a concrete wall with probably a little

3    window. And that's about it. Mostly it's just plain

4    fence.

5    Q.   Okay. How about the cells directly across from

6    the yard, are all of the cells on that tier?

7    A.   Yes.

8    Q.   What are they made of and do you have any

9    openings?

10    A.   No, there's no openings. Just still iron

11    doors, and there's probably like a little vent -- little

12    holes at the bottom. But, you know, nothing to reach

13    out or grab really like that.

14    Q.   Okay. So when you open up a cell, that's

15    basically how you cuff an inmate. You have to actually

16    open up the door --

17    A.   No. Actually, it goes through the pod officer.

18    We have a pod, and it's operated by a panel that you

19    press buttons to open the doors.

20    Q.   Okay. You mentioned a pod. Can you explain to

21    the jury what the pod is?

22    A.   Well, that's the control center of the whole --

23    the entire building. You know, every door is controlled

30

1    by an officer. You know, nothing can be -- it can be

2    opened with a key, but everything is done by a button,

3    by pushing a button.

4    Q.   Okay. Now, when you were walking Ernest Hill

5    down to the shower, he was cuffed, correct?

6    A.   Yes.

7    Q.   And how about Tyrone Guinn? When he was in the

8    yard, was he cuffed?

9    A.   No, they aren't in the yard cuffed.

10    Q.   So his hands are free and he's free to move

11    about the yard?

12    A.   Yes.

13    Q.   What is the size of the yard, approximately, if

14    you know? If you don't know, I don't want you guessing.

15    A.   I don't know. It's fairly large.

16    Q.   Now, what would you say the approximate

17    distance -- you described this narrow hallway. I mean,

18    the yard is directly along that hallway?

19    A.   Yes, it's right along. It's right there. You

20    can just easily walk to the fence.

21    Q.   Now, you said the feces, do you know what

22    direction it came from?

23    A.   Yes.

31

1    Q.   And where did it come from?

2    A.   It came from our right side.

3    Q.   But where did it really come from?

4    A.   It came from Yard 2.

5    Q.   Okay. And did you actually physically see

6    Tyrone Guinn throw --

7    A.   No.

8    Q.   -- the feces?

9    A.   No, I didn't.

10    Q.   What did you -- what was your first thought

11    when this happened to you?

12    A.   I was -- I was stunned because I couldn't

13    believe it was actually human feces on my body. So I

14    really didn't know what was going on, but after I gained

15    some kind of sense, I knew I had to secure. The first

16    thing to do all the time is to secure. So the first

17    thing I did was to secure Ernest Hill in the shower

18    because that was the closest place to me.

19    Q.   And did Officer Stevens help you do that?

20    A.   Yes.

21    Q.   Okay. And once you secured him in the shower

22    area, what do you do next?

23    A.   After that, Officer Stevens went to go get

32

1    Inmate Guinn and I assisted him with that. And we -- he

2    cuffed up from there in the yard, and we brought him to

3    the cell.

4    Q.   Okay. You cuffed Tyrone Guinn?

5    A.   Yes.

6    Q.   How were you able to accomplish that with him

7    in the yard?

8    A.   Well, there's a little panel to drop down to

9    allow them to put their wrists through. It's a little

10    flap.

11    Q.   And you were present when that happened?

12    A.   Yes.

13    Q.   And you still meanwhile have all of this

14    stuff --

15    A.   Yes.

16    Q.   Feces running down your side?

17    A.   Yes.

18    Q.   Okay. Could you describe the hallway? Was it

19    covered in any way with the feces?

20    A.   Yes, the floors were covered in feces. It was

21    very liquidy. The walls by probably around like cell 3

22    or 4, the walls were covered. Some cell doors were and

23    the fences.

37

1    Q.   As a part of the investigation that took place,

2    did you speak to Officer, or Investigator Drake about

3    that, what happened to you?

4        A.   Yes, I believe discussing matters and that was

5    about it. And, you know, he just helped me out with,

6    you know, just a whole understanding of things. That's

7    about it.

8        Q.   Okay.

9            MS. VAN DYKE:  May I have a moment, Your Honor?

10           THE COURT:  Yes.

11           MS. VAN DYKE:  Thank you.

12           Nothing further of this witness, Your Honor.

13                    CROSS-EXAMINATION

14   BY MS. WALKER:

15       Q.   Good afternoon, Officer.

16       A.   How are you doing?

17       Q.   So you work for the Department of Corrections,

18   right?

19       A.   Yes, ma'am.

20       Q.   And you have been there a year and five months?

21       A.   Yes.

22       Q.   Now, that would make it, if my math is correct,

23   was it June 30th when this incident allegedly occurred?

38

1        A.   Yes.

2        Q.   You would have been there about six months?

3        A.   Right.

4        Q.   So you were relatively new to the job, correct?

5        A.   Yes.

6        Q.   Still learning the ropes, what you're supposed

7    to do, all of that jazz?

8        A.   Somewhat.

9        Q.   Okay. And you were in a pretty -- a part of

10   the prison that has a lot of pretty tough guys, right?

11       A.   Right.

12       Q.   Okay. You indicated that you were escorting

13   Mr. Hill. Is that right?

14       A.   Yes.

15       Q.   And you were on the outside of the fence of

16   Yard 2?

17       A.   Uh-hmm.

18       Q.   You didn't look over towards Yard 2, but

19   something splattered you on the back, right?

20       A.   Right.

21       Q.   Now, you indicated that you got the feces on

22   your face?

23       A.   Right.

39

1        Q.   But you didn't get it in your mouth?

2        A.   Right.

3        Q.   You didn't get it in your eyes, and you were

4    facing forward, correct?

5        A.   Right.

6        Q.   Away from the feces?

7        A.   Right.

8        Q.   So more accurately, you got hit in the head?

9        A.   No, I was hit from across, from the direction I

10   was walking. I was walking as if my head was tilted

11   this way, and when it came across, it was in a motion

12   like this.

13       Q.   Okay. But you said you were looking forward is

14   what I thought you said earlier?

15       A.   Right, I was looking forward.

16       Q.   Now, you know, I know you said from the witness

17   stand and the jury box was how far the walk is. Is that

18   right?

19       A.   No, no, no. I meant as far as the width of

20   the -- the width of the walkway.

21       Q.   Okay.

22       A.   That's what I meant.

23       Q.   Okay. How far away were you from the fence of

40

1    the yard? Do you know?

2        A.   About two feet.

3        Q.   Two feet. Okay. Do you know -- do you have

4    any idea where -- how Mr. Guinn had feces in the rec

5    yard?

6        A.   Well, after we had -- after I had placed

7    Mr. Hill inside the shower, I did see that there was a

8    cup laying on the floor.

9        Q.   Okay.

10       A.   And it's usually the cup that's given to them

11   some time around lunchtime. Sometimes they get peanut

12   butter, and there was a peanut butter cup that was

13   laying on the ground.

14       Q.   Now, these guys, like I said, you're in a tough

15   part of the prison. It's important, obviously, for you

16   to keep a close eye on all of these individuals for

17   contraband, right?

18       A.   Right.

19       Q.   A little earlier you testified that Mr. Guinn

20   went out into the yard with his clothes?

21       A.   Right.

22       Q.   You didn't say anything about a cup at that

23   time, did you?

41

1    A.    Right.

2    Q.    And I would assume you checked the yard to make

3    sure before an inmate goes out there that there's no

4    contraband lying around. Would that be correct?

5    A.    Yes.

6    Q.    And did you bring the cup with you today?

7    A.    No.

8    Q.    It wasn't taken into evidence?

9    A.    I'm not sure.

10   Q.    You're not aware of that?

11   A.    All I do is take him. I had nothing to do with

12   it.

13   Q.    Okay.

14         Now, in your -- you recall making -- writing an

15   incident report?

16   A.    Yes.

17   Q.    I think you referred to that. Do you have a

18   copy of that with you?

19   A.    Yes.

20   Q.    You do?

21   A.    Yes.

22   Q.    Can you take that out and take a look at it for

23   me?

42

1    A.    Sure.

2    Q.    I'm going to give you a couple of seconds to

3    just read it over to yourself and then ...

4         Okay. If you look at the second sentence,

5    which says, I'll read it and you can tell me if it's

6    accurate: While walking by Yard 2 with Inmate Hill,

7    it's blacked out on my copy, but is that correct?

8    A.    Okay. Yes.

9    Q.    Inmate Guinn took a container out of his jumper

10   and threw liquid at Inmate Hill. Is that right?

11   A.    Yes.

12   Q.    Okay. So from that you had concluded that it

13   was Inmate Hill that he was trying to hit. Is that

14   correct?

15   A.    Yes.

16   Q.    Okay. He wasn't trying to hit you; it just

17   happened you were in the wrong place at the wrong time?

18   A.    (Witness indicating.)

19   Q.    Okay.

20         MS. VAN DYKE: Your Honor, may we approach?

21         THE COURT: Yes.

22         (Whereupon, the following sidebar conference

43

1         MS. VAN DYKE: The State in this case was

2    not -- obviously, the defendant was interviewed in this

3    case. The State did not intend on offering his

4    statement. The incident report that Ms. Walker's

5    referring to basically includes, you know, some

6    conclusions based on the defendant's statement because

7    if -- the testimony Officer Shannon had said is that he

8    didn't see him throw it. How did he know it was in his

9    jumpsuit? The only reason we know that is because of

10   the defendant's statement. I'm concerned about hearsay

11   statements basically, essentially, in that report.

12         MS. WALKER: First of all, Your Honor, looking

13   at the report, it does not say Mr. Guinn told me that he

14   intended to hit somebody else. He wrote a report based

15   on evidence that he had. It's a conclusion that he

16   wrote. He made it. That's not hearsay at all. If it

17   had said Guinn said such and such, he had drawn a

18   conclusion. We don't know how he had drawn the

19   conclusion.

20         THE COURT: Are you going to ask him how he

21   drew his conclusion?

22         MS. WALKER: No, she can do that -- it's a

23   question of -- for the jury.

44

1         MS. VAN DYKE: Your Honor, it also calls for

2    speculation, too, because how is he to know how the

3    inmate --

4         MS. WALKER: He put it in his report. That's

5    the basis of this investigation. I think that's a fair

6    question to ask him, what he put in his report. What he

7    based it on is what he based it on. That's a question

8    to put in front of the jury. Additionally, even if

9    she's complaining that it is hearsay, it's an exception

10   to the hearsay rule under 803(3) because it goes to

11   Mr. Guinn's state of mind as to intent and, therefore,

12   it's an exception.

13         MS. VAN DYKE: It's an admission of the party

14   opponent that the defendant cannot use unless he takes

15   the stand.

16         THE COURT: Well, just a moment. Let's go back

17   to the 803(3).

18         MS. WALKER: 3.

19         THE COURT: It is a conclusion as to his state

20   of mind, but it's not a statement as to his state of

21   mind.

22         MS. WALKER: Well, she can't have it both ways,

45

1  properly examine him on it because he put it in the
2  report. If she's saying, no, she can't question him on
3  the basis of the conclusion because it's hearsay, then
4  she can't have that either because of 803(3).
5        THE COURT: Well, the conclusion that he's
6  reached I think is admissible.
7        MS. WALKER: Okay.
8        THE COURT: The question is --
9        MS. WALKER: I'm not going to ask him if he
10 said anything.
11       THE COURT: But what are you going to ask him
12 then with regard to the basis of his conclusion?
13       MS. VAN DYKE: I don't think it developed
14 enough for me to at this point say what I would ask him.
15 My concern is that it's bringing in evidence that the
16 only way the witness knew it was because of defendant's
17 statement. And that's my concern.
18       THE COURT: All right. Well, he hasn't
19 testified to that yet, and he has not yet indicated that
20 he's going to. If he does, we'll handle the hearsay
21 issue at that point.
22       MS. WALKER: Absolutely.
23       THE COURT: But I don't think it's admissible

46

1  as to defendant's state of mind unless it is...
2        MS. WALKER: The point I'm trying to get is his
3  intent, what was his intent.
4        MS. VAN DYKE: The defendant has --
5        MS. WALKER: And 803(3) is immaterial whether
6  the witness is available. It goes to state of mind.
7        THE COURT: Just a moment.
8        Well, it depends on when the statement was
9  made. I mean, if he made the statement too far after
10 the fact --
11       MS. WALKER: He made it that day when he was
12 interviewed.
13       THE COURT: Well, that may not be close enough
14 in time to get to the 803(3). Just because it goes to
15 intent doesn't make it automatically admissible under
16 803(3). So if you're even thinking about that, we have
17 to go outside the presence of jury and talk about that.
18       MS. VAN DYKE: I'm sorry, I guess this a
19 premature objection.
20       THE COURT: That's all right.
21       MS. WALKER: I just want to make sure I can ask

47

1        THE COURT: Right.
2        MS. WALKER: Thanks.
3        (Sidebar conference was concluded.)
4  BY MS. WALKER:
5        Q. All right, Officer. The last thing you had
6  indicated was that you had put in your report that
7  Mr. Guinn took the container out of his jumper and threw
8  it at Inmate Hill and missed him and hit you. Is that
9  right?
10       A. **Right.**
11       Q. Okay. And everything you would put in your
12 report would be accurate and truthful. Is that correct?
13       A. **Yes.**
14       Q. And you wouldn't mislead anybody with the
15 incident report, would you?
16       A. **No.**
17       Q. Okay. Additionally, when you were talking --
18 when you go onto explain the situation when they were
19 cuffing him, you indicate that there was a tussle. Is
20 that right?
21       A. **Yes.**
22       Q. And, now, Officer Stevens received a cut to his
23 ring finger and pointer finger?

48

1        A. **Right.**
2        Q. Now, I believe your testimony was that that was
3  a result of the handcuffs. Is that right?
4        A. **Yes.**
5        Q. And it was a result of trying to put the
6  handcuffs back on Mr. Guinn?
7        A. **Right.**
8        Q. And the reason that there was this tussle that
9  ensued was that Mr. Guinn was pulling away?
10       A. **Right.**
11       Q. So Mr. Guinn didn't -- wasn't attacking the
12 officer. Is that right?
13       A. **No, he wasn't attacking.**
14       Q. He was trying to pull away from what -- your
15 best -- your perception of the situation was that
16 Mr. Guinn was trying to get away and that's why he had
17 to be subdued?
18       A. **Right.**
19       Q. Were the clothes packaged and put into evidence
20 at all? Do you know?
21       A. **Yes, ma'am.**

49

1    Q.   You do not. Do you know whether this, I guess,

2    concoction or the fluid, the feces, that's being

3    purported by the prosecutor, was that ever tested? Do

4    you know?

5    A.   No. Well, I'm not sure, so...

6    Q.   So you don't know?

7    A.   I don't know.

8    Q.   Okay. And you didn't have to see a nurse or

9    anybody with respect to --

10    A.   I did see a nurse at the time, but she says as

11    long as it didn't get into like my eyes, my ears, or my

12    mouth, she said then everything should be fine.

13    Q.   You were okay?

14    A.   Yes.

15    Q.   Okay.

16            MS. WALKER: I have nothing further, Your

17    Honor.

18            REDIRECT EXAMINATION

19    BY MS. VAN DYKE:

20    Q.   Physically, you're okay, but how did you feel

21    when that happened to you?

22    A.   Humiliated, and it just -- it felt unhuman.

23    Q.   Humiliated and unhuman?

50

1    A.   Yes.

2    Q.   Now, Ms. Walker referred to your incident

3    report that you wrote up after the incident took place,

4    and you said that the -- in your report you referred to

5    the container was taken -- Guinn took the container out

6    of his jumper and threw the liquid, basically?

7    A.   Right.

8    Q.   At Inmate Hill?

9    A.   Yes.

10    Q.   Okay. Was that an assumption that you made at

11    that time?

12    A.   Yes, at the time it is -- it was an assumption

13    because we keep the bags, their clothes, and everything.

14    We keep all of the articles outside of the yard. So it

15    is evident he didn't have anything in his hand when he

16    came out. So it had to come from in the jumper.

17    Q.   Okay. Was Ernest Hill struck?

18    A.   No.

19    Q.   Okay. How close were you to Ernest Hill?

20    A.   He was right beside me.

21    Q.   Okay. Directly beside you?

22    A.   Yes.

23    Q.   Would you say that you were almost touching

51

1    each other or were you touching each other?

2    A.   No, we weren't touching each other. There was

3    the proper space between us.

4    Q.   Okay. How much space?

5    A.   He was probably about right here.

6    Q.   And you said he, to your knowledge, did not

7    have any feces on him?

8    A.   No.

9    Q.   Anything on him. Okay.

10            Now, this container that we assume was the

11    container that collected the feces by Mr. Guinn, Tyrone

12    Guinn, is that considered contraband?

13    A.   Well, if it's kept in the room, yes, it is

14    considered contraband. It is not used for its purpose

15    and then thrown away, it's contraband.

16    Q.   Now, is this a large cup? Small cup? Can you

17    describe?

18    A.   The cup is about, probably about this size

19    right here.

20    Q.   Okay. And you said he took a number of boxer

21    shorts, articles of clothing?

22    A.   Yes.

23    Q.   And he also had a jumpsuit on?

52

1    A.   Yes, he had a jumpsuit and sweatshirt on.

2    Q.   And your assumption was that he concealed that?

3    A.   Yes.

4    Q.   In the uniform?

5    A.   Yes.

6            MS. VAN DYKE: Thank you.

7            MS. WALKER: Just a couple on re-cross, Your

8    Honor.

9            CROSS-EXAMINATION

10    BY MS. WALKER:

11    Q.   I think you testified earlier that the -- that

12    Yard 2 was on your right-hand side, correct?

13    A.   Yes.

14    Q.   And I guess Mr. Hill then was on your left-hand

15    side?

16    A.   Yes.

17    Q.   And you got struck on your right-hand side?

18    A.   Yes.

19    Q.   Okay. And Officer Stevens was behind you?

20    A.   Yes.

21    Q.   So his right-hand side was also facing the

22    yard?

23    A.   Yes.

57

1    is drafted.

2            MS. VAN DYKE: In some way it's work product

3    because they follow their own administrative charges,

4    and I'm not comfortable with it being in front of a

5    jury.

6            THE COURT: I'm going to retain this and hold

7    my ruling until I've had a chance to look at this.

8            MS. VAN DYKE: Thank you, Your Honor.

9            (Sidebar conference was concluded.)

10   BY MS. WALKER:

11       Q.   You indicated that you had had a previous

12   contact with Mr. Guinn?

13       A.   Yes.

14       Q.   And there was no problems between the two of

15   you?

16       A.   No.

17       Q.   Okay.  So when you drew the conclusion that you

18   drew, it was based on what you knew about the two

19   inmates and yourself and your relationships, correct?

20       A.   I said as far as what?

21       Q.   Well, he didn't have any problems with you that

22   you know of, correct?

23       A.   Right.

58

1        Q.   And you drew the conclusion he was throwing it

2    at the other inmate because why?

3            MS. VAN DYKE: Object, Your Honor.

4            MS. WALKER: Actually, I'll withdraw the

5    question.

6    BY MS. WALKER:

7        Q.   You drew that conclusion.  Is that correct?

8        A.   I mean, I have no previous history of, you

9    know, if they did have any problems.

10       Q.   Okay.

11           MS. WALKER: Thank you.  Nothing further.

12           MS. VAN DYKE: Just prompted a question.

13                   REDIRECT EXAMINATION

14   BY MS. VAN DYKE:

15       Q.   Were you aware of whether or not the defendant

16   and Ernest Hill had any problems?

17       A.   No.

18           MS. VAN DYKE: Okay.  Thank you.  Nothing

19   further of this witness, Your Honor.

20           THE COURT: You may step down.

21           You may call your next witness.

22           MS. VAN DYKE: Thank you.  The State would call

59

1            THE COURT: Perhaps, we should take a

2    five-minute recess before we put Officer Stevens on the

3    stand.

4            (Whereupon, jury leaves the room at 2:49 p.m.)

5            THE COURT: We'll reconvene in five minutes.

6            (Recess taken.)

7            THE COURT: Please bring in the jury.

8            (Whereupon, jury enters the room at 3:03 p.m.)

9            THE COURT: You may call your next witness.

10           MS. VAN DYKE: Officer Neil Stevens, Your

11   Honor.

12           THE COURT: Do we need the diagram?

13           MS. VAN DYKE: No, we do not.

14           THE COURT: All right.  We can move that then.

15           NEIL STEVENS, having duly been sworn, was

16   examined and testified as follows:

17                   DIRECT EXAMINATION

18   BY MS. VAN DYKE:

19       Q.   Good afternoon, Officer Stevens.

20       A.   Hello.

21       Q.   With whom are you employed?

22       A.   Delaware Correctional Center.

23       Q.   And how long have you been an employee at

60

1    Delaware Correctional Center?

2        A.   Five years.

3        Q.   Do you mind me asking how old you are?

4        A.   26.

5        Q.   In what capacity do you work with the Delaware

6    Correctional Center?

7        A.   What -- I don't understand.  Capacity?

8        Q.   What is your position with --

9        A.   I'm a correctional officer.

10       Q.   Have you always maintained that position?

11       A.   Yes, ma'am.

12       Q.   Since your employment began?

13       A.   Yes, ma'am.

14       Q.   And what are your current duties and

15   responsibilities, if you can describe it briefly for the

16   jury?

17       A.   Just do routine checks, make sure inmates

18   aren't getting out of line, recreation, feeding of

19   inmates.

20       Q.   Okay.  And have you received any specialized

21   training in that area to do your job, to perform your

22   job?

65

1    A.   At that moment, yes, ma'am.

2    Q.   Okay. Are inmates permitted to carry personal

3    items into the yard?

4    A.   No, ma'am.

5    Q.   Okay. How about like their boxers, shoes,

6    shower shoes?

7    A.   Shower stuff, they normally put that on the

8    outside of the yard. They leave it on the outside of

9    the yard or they place it on the shower that they're

10   going to receive the shower at.

11   Q.   Okay. So they're not permitted to have

12   anything inside the yard?

13   A.   No, ma'am.

14   Q.   Okay. So you don't recall seeing Inmate Guinn

15   carrying anything?

16        MS. WALKER: Objection, Your Honor. Asked and

17   answered.

18        THE COURT: I'll allow one more question. Go

19   ahead.

20        MS. VAN DYKE: I'm sorry, Your Honor?

21        THE COURT: Go ahead. You may ask that

22   question.

23   BY MS. VAN DYKE:

66

1    Q.   Do you recall him carrying anything, container,

2    anything?

3    A.   At any point?

4    Q.   Uh-hmm.

5    A.   Yes, there was a container, almost looked like

6    a peanut butter jug or something in that manner.

7    Q.   Why do you refer to it as a peanut butter jug?

8    A.   Because that's what it looked like. It looked

9    like a peanut butter container or maybe a juice

10   container.

11   Q.   What was the size? You did that, so...

12   A.   Just probably about maybe this tall, that

13   round.

14   Q.   When did you observe that container?

15   A.   After he -- after Officer Shannon got hit by

16   the feces and urine.

17   Q.   Okay. All right. We're going to get to that

18   right now. At what point -- what were you doing prior

19   to that incident occurring? What were you and Officer

20   Shannon doing?

21   A.   Removing another inmate from his cell.

22   Q.   And who was that inmate?

67

1    Q.   Okay. And where were you taking that inmate?

2    A.   To the shower.

3    Q.   Okay. And in the process of taking him to the

4    shower, where is Tyrone Guinn at this time?

5    A.   In Yard 2.

6    Q.   Okay. And why don't you lead the jury through

7    your -- what happened, the process?

8    A.   Well, Mr. Hill was removed from lower 10. I

9    was behind Officer Shannon and Inmate Hill. Then I

10   heard something, looked up, and Officer Shannon had

11   feces and urine just running all down his face, all over

12   his face, the back of his head, all over the right side

13   of his body.

14   Q.   Okay. How did you know it was feces and urine?

15   A.   You could smell it.

16   Q.   Could you -- you could also see it, right?

17   A.   Yeah, I could see it.

18   Q.   Okay. Did it go anywhere else?

19   A.   I had a little bit on my right pant.

20   Q.   What do you mean by "a little bit"?

21   A.   A splatter.

22   Q.   Okay. And where on your pant leg was it?

23   A.   About the knee level on the right-hand side.

68

1    Q.   Okay. Was it on the back? The side?

2    A.   It was on the side.

3    Q.   Okay. And predominantly where would you say

4    Malcolm Shannon, Officer Shannon, was hit on the --

5    A.   All on his right-hand side and on the backside

6    of his right-hand side.

7    Q.   Okay. And what direction?

8    A.   It came from our right.

9    Q.   Okay. And what is -- what is the only --

10   A.   Yard 2.

11   Q.   Is that the only thing to your right?

12   A.   Yes, ma'am.

13   Q.   And who was in Yard 2?

14   A.   Inmate Guinn.

15   Q.   Was anyone else in that yard?

16   A.   No, ma'am. He was the only person out besides

17   Mr. Hill, and he was handcuffed behind his back.

18   Q.   Okay. Was Tyrone Guinn, was he cuffed at any

19   point when he was in the yard?

20   A.   In the yard until we take him off at the flap.

21   That's maybe a period of five seconds.

22   Q.   Okay. So when he's in the yard, he's uncuffed?

69

1    Q.    Did you actually see Tyrone Guinn throw

2    anything?

3        A.    No, ma'am.

4    Q.    Okay. Do you recall whether or not Ernest

5    Hill, the other inmate that you were escorting, whether

6    or not he had any feces/urine on him?

7        A.    I do not recall. I don't believe so.

8        Q.    How far away would you say Officer Shannon was

9    from the recreation yard?

10        A.    Well, on the walkway, I mean, there's only

11    maybe a space of four-feet wide to walk in between the

12    wall and the yard fence. So not far.

13        Q.    Okay. Do you recall seeing Inmate Guinn in the

14    yard?

15        A.    Yes, ma'am.

16        Q.    Okay. Do you remember seeing him at any

17    particular location at any time in the yard?

18        A.    All over it pretty much.

19        Q.    How about when you were escorting Ernest Hill,

20    did you take any particular -- pay any particular

21    attention to Tyrone Guinn at that point?

22        A.    Not until after the incident. I looked up, and

23    he was maybe three or four feet back from the fence.

70

1    Q.    Okay. Three or four feet back from the fence?

2    A.    Yes, ma'am.

3    Q.    Did he have anything in his hand?

4    A.    The container.

5    Q.    Could you tell the jury what your observations

6    were of Officer Shannon, like the way he responded to

7    what happened?

8        A.    Mr. Shannon was -- he was in complete shock. I

9    mean, he was just in complete shock, probably denial

10    that he had feces and urine on his face and running --

11    dripping down his ears and hair.

12    Q.    And what about you, what were you thinking at

13    that time?

14        A.    I felt bad for him.

15        Q.    What was the thought that you had at that point

16    once you realized the incident occurred? What did you

17    do next?

18        A.    I told Mr. Shannon to take Mr. Hill to the

19    shower, secured him in there, and then I told Mr. Guinn

20    to cuff up. And he did.

21        Q.    What does "cuff up" mean?

22        A.    Back up to the flap on the yard, place his

71

1    take him out of the yard.

2    Q.    Okay. And he was compliant in doing that?

3    A.    Yes, he was compliant.

4    Q.    And meanwhile, where is Officer Shannon?

5    A.    Shannon, Officer Shannon, had come back to me.

6    Q.    Okay. So he had to actually go on his own with

7    Inmate Hill?

8        A.    It was only a couple more steps from where they

9    were at.

10    Q.    Okay. And was there any necessity as to why

11    you needed to cuff Tyrone Guinn at that time?

12        A.    It's just better to take care of a situation

13    right away if you can.

14        Q.    Why is that?

15        A.    This way he doesn't have time to do something

16    else.

17    Q.    You said that he was compliant in cuffing him.

18    What was your next step at that point?

19        A.    To take him out of the yard and place him back

20    in his cell.

21    Q.    And where is his cell in relation to the yard?

22    A.    Straight across, pretty much.

23    Q.    And was Officer Shannon back with you?

72

1    A.    Yes, ma'am.

2    Q.    Okay. And how -- could you explain to the jury

3    the process that you went through to get Tyrone Guinn

4    back into his cell?

5        A.    I cuffed him at the flap in the yard. Removed

6    him from the yard. Brought him back to his cell. When

7    we bring him back to his cell, went to take one cuff

8    off, and he pulled away. As soon as he pulled away,

9    just restrained him. Took him down. Put the cuff back

10    on his right wrist, and then removed him from the cell,

11    and brought him out to the interview room.

12    Q.    You said "he." When you started to take the

13    cuff off of his one hand, is this occurring while he's

14    inside his cell?

15    A.    Yes, ma'am. He's at the cell, and the door's

16    maybe open this much.

17    Q.    Okay. You're able to get in through that door?

18    A.    I am? Yes, ma'am.

19    Q.    With Tyrone Guinn?

20    A.    Yes, ma'am.

21    Q.    Okay. And you say he pulls away. Well, if

22    you're undoing the cuff, could you describe how he

A. **It was -- there was a good chunk of skin ripped out and it was hanging off a little bit.**
Q. Okay. Once this incident happened, did you stay on shift or did you go somewhere else?
A. **Captain McCraner actually sent myself and Officer Shannon home to get showers and get changed.**
Q. And did you return for your shift?
A. **Yes, ma'am.**
Q. And you worked till?
A. **8 a.m. the next morning.**
Q. You compiled an incident report in regards to this case, correct?
A. **Yes, ma'am.**
Q. Okay. Did you -- I believe you already stated you did not see Tyrone Guinn throw the container of feces?
A. **Excuse me?**
Q. You did not see Tyrone Guinn throw the container of feces?
A. **At Officer Shannon? No, ma'am.**
Q. Okay. Did he throw it at Officer Shannon, did he throw it at Inmate Hill, or was he throwing it at you? Do you know? I don't want you to assume, but do

you --
A. **No, I don't know.**
Q. There's a reference in your report that he threw the container or the feces at Inmate Hill. Is there -- is that an assumption on your part?
A. **No, it said towards.**
Q. I'm sorry?
A. **It said towards Inmate Hill. It did not say at him. It said towards him.**
Q. Towards him?
A. **Yes, ma'am.**
Q. So that would also refer to towards you and Officer Shannon?
A. **Yes, ma'am. In the direction of.**
Q. Are you aware of any -- is there any bad blood between you and Inmate Guinn?
A. **Never, no.**
Q. Are you aware of any bad blood between Officer Shannon and Inmate Guinn?
A. **No, ma'am.**
Q. How about any -- are you familiar with any bad blood between Inmate Ernest Hill and Tyrone Guinn?

Q. Okay. As you work on a tier, are you familiar with who generally has a problem with who as far as inmates?
A. **If you work the tier long enough, yes, ma'am, you do learn, but I never worked that building pretty much, so...**
Q. You never worked that building?
A. **I had, but that's not my area. That's not the designated area for me to work every day. I was just there on overtime that day.**
Q. Okay. But there was nothing that led you to believe --
A. **No, ma'am.**
Q. -- as far as that there was bad blood between Inmate Guinn and Ernest Hill?
A. **No, ma'am.**
**MS. VAN DYKE: Thank you. Nothing further.**

CROSS-EXAMINATION

BY MS. WALKER:
Q. Good afternoon, Officer.
A. **How are you doing?**
Q. Good. Thanks. How are you doing?
A. **Fine. Thank you.**

Q. All right. I just want to go over again how you guys were lined up. My understanding, and let me know if I'm wrong, is you were walking past Yard 2, correct?
A. **Yes, ma'am.**
Q. You, Officer Shannon, and Mr. Hill. Is that correct?
A. **Yes, ma'am.**
Q. And Officer Shannon was to the right of Mr. Hill?
A. **Yes, ma'am.**
Q. And you were behind Officer Shannon?
A. **I was. Yes, ma'am.**
Q. And on the right-hand side would be Yard 2 where Mr. Guinn was?
A. **Yes, ma'am.**
Q. Okay. Now, you indicated that you weren't aware of any bad blood between Mr. Guinn and Mr. Hill, right?
A. **Yes, ma'am.**
Q. And as the prosecutor indicated, you filed an incident report in this case, correct?

81

1    Q.   Do you have a copy of that?

2    A.   **In my back pocket.**

3    Q.   Can you pull it out? Just take a look at it

4    for me and refresh your recollection, and I'll ask you a

5    couple of questions.

6    A.   **Okay.**

7    Q.   Okay. You indicated, as she asked you, whether

8    or not, and I think I corrected her properly, that you

9    threw -- excuse me -- that Mr. Guinn threw the fluid

10   towards Inmate Hill. Is that correct?

11   A.   **Yes, ma'am.**

12   Q.   And everything in this report is truthful and

13   accurate, correct?

14   A.   **Yes, ma'am.**

15   Q.   You wouldn't lie?

16   A.   No, ma'am.

17   Q.   In an indent report?

18   A.   No, ma'am.

19   Q.   Okay. Now -- but you testified earlier that

20   you had received -- had gotten feces on yourself,

21   correct?

22   A.   **Yes, ma'am.**

23   Q.   And Officer Shannon did as well?

82

1    A.   **Yes, ma'am.**

2    Q.   So -- but you didn't choose to write that he

3    threw the fluid towards you and Officer Shannon?

4    A.   **No, ma'am.**

5    Q.   Okay. And you say that the feces and urine did

6    not hit Inmate Guinn. Is that a typo? Should that read

7    Hill?

8    A.   **Yes, that was a typo. That should be Ernest**

9    **Hill.**

10   Q.   So the urine and feces did not hit Inmate Hill,

11   but did hit Shannon in his head, face, shirt, and pants

12   and that you received a splash of feces?

13   A.   **Yes, ma'am.**

14   Q.   So you premised that particular sentence about

15   you and Officer Shannon receiving feces by the fact that

16   Hill didn't get hit?

17   A.   **Excuse me?**

18   Q.   The beginning of that sentence before you --

19   A.   **Started off with Inmate Hill?**

20   Q.   Right.

21   A.   Yes, ma'am.

22   Q.   You talk about him first before you get to you

83

1    A.   **Yes, ma'am.**

2    Q.   Okay. Now, I suppose, as you indicated,

3    Officer Shannon, he was shocked, correct?

4    A.   **Yes, ma'am.**

5    Q.   And are you aware that he was only on the job

6    six months at that time?

7    A.   **I knew he was fairly new. Yes, ma'am.**

8    Q.   Fairly new. And were you kind of like his big

9    buddy or more experienced person to be with him? Is

10   that the way it works there?

11   A.   **Sometimes, yes.**

12   Q.   Okay. Now, were you upset that feces landed on

13   you?

14   A.   **Not at the time because I had no idea it was on**

15   **me until I looked afterwards.**

16   Q.   And when was that that you ascertained that?

17   A.   **After we had placed Inmate Guinn in the**

18   **interview room.**

19   Q.   Okay. But you knew right away that Shannon had

20   it on him, obviously?

21   A.   **Yes, ma'am. Yes, ma'am.**

22   Q.   Okay. Now, you indicated that you then went --

23   at some point after Mr. Hill was placed in the shower

84

1    that you went to the yard and cuffed Mr. Guinn. Is that

2    correct?

3    A.   **Yes, ma'am.**

4    Q.   And you did that by having him place his hands

5    through the flap?

6    A.   **Yes, ma'am.**

7    Q.   And then you brought him out?

8    A.   **Yes, ma'am.**

9    Q.   Okay. And then you took him to his cell?

10   A.   **Yes, ma'am.**

11   Q.   Now, is there a flap on the cell door?

12   A.   **Not on the door. No, ma'am.**

13   Q.   Where is the --

14   A.   **The flap is -- if this is face level at the**

15   **door, the flap is on the wall over here. That's to**

16   **place -- primarily to place laundry and the food trays**

17   **in the cell.**

18   Q.   Do you use it to cuff people up?

19   A.   **No, ma'am. Never.**

20   Q.   You actually cuff people -- excuse me. When

21   you take people to the yard?

22   A.   **Yes, ma'am.**

85

1    A.  Yes, ma'am.

2    Q.  And then you uncuff them through the flap?

3    A.  In the yard. Yes, ma'am.

4    Q.  So any time that you're dealing with an

5    individual in their cell, you'll go in there and they're

6    not cuffed?

7    A.  No, there's actually a system where the door's

8    opened. The door slides. It can slide all the way

9    open. And then if you place -- there's a bar that

10   places on the food flap.

11   Q.  Okay.

12   A.  And I wouldn't say it locks in there, but

13   there's a slit for it to sit on. Therefore, the door

14   can only open up so much.

15   Q.  Okay.

16   A.  Then that's maybe about this much.

17   Q.  And that's how you get them in and out and then

18   you uncuff them?

19   A.  Yes, ma'am. Most of the time. Yes, ma'am.

20   Q.  And Mr. Guinn did not give you any problem at

21   all when you cuffed him, correct?

22   A.  Not at the yard. No, ma'am.

23   Q.  But he gave you a hard time when you uncuffed

86

1    him?

2    A.  Yes, ma'am.

3    Q.  When he was in his cell?

4    A.  Yes, ma'am.

5    Q.  His habitat, correct?

6    A.  Yes, ma'am.

7    Q.  Okay. And you testified that he was pulling

8    away from you and that's what caused the problem here,

9    correct?

10   A.  Yes, ma'am.

11   Q.  And he was trying to get away from you?

12   A.  He was turning around, pulling away. Yes,

13   ma'am.

14   Q.  He didn't try to hit you?

15   A.  No, ma'am.

16   Q.  He wasn't trying to put you -- throw you to the

17   ground or anything?

18   A.  No, ma'am.

19   Q.  In fact, you did that to him to restrain him,

20   correct?

21   A.  Yes, ma'am.

22   Q.  You then indicated also that Mr. -- excuse

23   me -- that you had found some type of container. Was

87

1    that found in the yard?

2    A.  I had seen the container. I don't know...

3    Q.  You don't remember where?

4    A.  I seen the container in his hand.

5    Q.  In his hand?

6    A.  Before he came to cuff -- for him to handcuff

7    him in the yard. He had thrown it down on the yard

8    ground.

9    Q.  So it was on the ground?

10   A.  In the yard. Yes, ma'am.

11   Q.  And you saw it down on the ground in the yard?

12   A.  Yes, ma'am.

13   Q.  Did you recover that item?

14   A.  I did not. No, ma'am.

15   Q.  Isn't it true that when inmates go into the

16   yard that it's important that there not be any

17   contraband in the area?

18   A.  Yes, ma'am.

19   Q.  Okay. So someone would have had to collect

20   that item at some point, correct?

21   A.  In the yard?

22   Q.  Yes.

23   A.  Yes, ma'am.

88

1    Q.  But you don't know who that was?

2    A.  I have no idea.

3    Q.  And you don't know whether that was done?

4    A.  If it was collected?

5    Q.  Right.

6    A.  I can't say I do, no.

7    Q.  Okay. Were your clothes collected?

8    A.  Yes, ma'am.

9    Q.  And are they here today?

10   A.  I don't see them here.

11   Q.  That you're aware of?

12   A.  Not that I'm aware of. No, ma'am.

13   Q.  Do you know whether the substance was ever

14   tested, to your knowledge, the items --

15   A.  I can't say I do. No, ma'am.

16   Q.  Okay. And you indicated earlier that you never

17   had a problem with Mr. Guinn before that?

18   A.  No, never.

19   Q.  Okay. And you weren't on the tier long enough

20   to know the ins and outs of all of the relationships

21   between the prisoners?

22   A.  Not on that tier. No, ma'am.

23   Q.  You then testified that you then went to see

101

1     this. It's unduly prejudicial. The fact that she's

2     already called a couple of officers to testify to the

3     nature of the confinement of that area, it's becoming

4     prejudicial. To now come in with death row inmates and

5     other maximum security inmates, that's not even relevant

6     to the point of what's going on here.

7          THE COURT:  Where are you going with this?

8          MS. VAN DYKE:  I'm moving onto Building 19,

9     which is where the defendant was.

10         THE COURT:  All right.  I think for the

11    purposes of these proceedings it's not necessary to

12    describe by category the level of security this

13    defendant was under because that could possibly be

14    unduly prejudicial with regard to what he was convicted

15    of.  Of course, if he takes the stand, that point

16    becomes moot.

17         MS. WALKER:  Right.

18         THE COURT:  But you certainly can explore the

19    nature of the security in that building, but not by type

20    or category.

21         MS. VAN DYKE:  I wasn't really sure I was going

22    in that area, but I will move on.

23         THE COURT:  All right.

102

1          (Sidebar conference was concluded.)

2          THE COURT:  You may proceed when the reporter's

3     ready.

4          MS. VAN DYKE:  Thank you.

5     BY MS. VAN DYKE:

6          Q.   Sergeant Phillips, are you familiar with Tyrone

7     Guinn?

8          A.   Yes, I am.

9          Q.   And how are you familiar with him?

10         A.   He has been housed in the SHU ever since I've

11    been back at DCC.

12         Q.   Okay.  And do you know what building he was

13    located in June 30th, 2004?

14         A.   Yep, Building 19.

15         Q.   Okay.  And could you please explain to the jury

16    what standard operating procedures apply with respect to

17    the inmates in Building 19 of the SHU?

18         A.   In Building 19 they are max inmates.  Always

19    have two-man backup on the inmates at that time.

20    Actually, now it's changed to three-man backup.  At that

21    time it was two.

103

1     they don't come out of their cells unless they have a

2     visit, court, or some kind of administrative function

3     they have to do in Building 20.  The officers in the

4     building feed them through a food flap.  When the

5     inmates are transported, they're transported by

6     handcuffs.  If they're staying on the tier and if

7     they're going off of the tier, out of the building,

8     they're shackled and handcuffed.

9          Q.   Okay.  And you said you do know Tyrone Guinn as

10    an inmate.  Do you see him in the courtroom today?

11         A.   Yes, that's correct.  He's seated in the

12    greenish-colored shirt to my right.

13         Q.   Thank you.

14              Do you recall the incident involving Tyrone

15    Guinn, Officer Shannon, and Officer Stevens?

16         A.   Yes, I do.

17         Q.   On June 30th, 2004?

18         A.   Yes, ma'am.

19         Q.   And what was your involvement in that incident?

20         A.   I was called as backup.  I was on the A and B

21    side.  This happened on the C and D side, and I was

22    called on the radio as backup.  I responded.  Officer

23    Stevens explained to me that, which I could see, that

104

1     Officer Shannon had just had feces thrown all over him.

2     And when I walked into the tier, I saw Officer Shannon

3     with feces dripping down from the back of his head, over

4     his face, onto his clothes.  And Officer Stevens had on

5     his right -- back of his right leg feces on it, on the

6     clothes.

7          Q.   Okay.  Was there feces anywhere else?

8          A.   Yes, there was feces hanging from the Yard 2,

9     which was where Inmate Guinn was, all over the floor and

10    all over the cell doors of 4 and 8.

11         Q.   Okay.  You said there was feces all over Yard

12    2.  Why on yard --

13         A.   Each yard in the building is surrounded by a

14    cage, kind of like a dog kennel cage.  And it goes from

15    floor to ceiling.  And it was hanging from the actual

16    cage itself, dripping down to the floor, just dripping

17    down.

18         Q.   Okay.  How did you know what it was?

19         A.   It smelled like feces.

20         Q.   Okay.  And were you certain of that?

21         A.   Absolutely.

1    Q.    Well, who was the fortunate person that got to

2    cleanup? Do you recall? Do you know that?

3        A.    Myself and a Sergeant Percheck acquired two

4    other inmates to cleanup the feces on the floor, the

5    cell doors, and the yard.

6        Q.    Okay. And do you know what procedure they had

7    to follow in order to cleanup something like that?

8        A.    We obtained biohazard suits, red evidence or

9    red biohazard bags that were provided by medical. Any

10   time you have a biohazard we get those bags to use. We

11   used bleach and water to mop everything down. After

12   everything was cleaned up, everything that we used was

13   put in red biohazard bags and sent to medical for them

14   to dispose of.

15       Q.    Okay.

16       A.    Which is their procedure.

17       Q.    The bag that you were just describing, the

18   biohazard red bag, was that the same bag?

19       A.    They were the same type, except on the

20   biohazard bags that we put the clothes in, we tagged

21   them with an evidence tag so we would know the evidence.

22   And that was taken out by Staff Lieutenant Rispoli, at

23   the time he was lieutenant, where the cleanup bags had

1    to be taken out of the building until later on that

2    night.

3        Q.    Now, there's been some discussion you haven't

4    been in the courtroom for in regards to the incident

5    reports that are created. You've already created an

6    incident report as well, correct?

7        A.    That's correct.

8        Q.    And there's been mention in Officer Shannon's

9    report as well as Officer Stevens' report that Inmate

10   Guinn had thrown the feces toward or at Inmate Hill. Is

11   that an assumption on your part, that the feces was

12   thrown at Inmate Hill?

13       A.    I have no idea who it would have been thrown

14   at. When we take the inmates out to rec, the officers

15   are with the inmates. So if you threw it in the

16   direction of an inmate, you're going to hit an officer.

17       Q.    And you were not present for the incident?

18       A.    No, I came in after the incident. After the

19   feces had been thrown, I was called.

20       Q.    And so you have no idea what the defendant's

21   intention was at the time that it happened?

22       A.    No.

23            MS. VAN DYKE: May I have a moment, Your Honor?

1            THE COURT: Certainly.

2    BY MS. VAN DYKE:

3        Q.    We've already talked about the clothing,

4    pictures. Do you recall seeing any type of container or

5    cup?

6        A.    There was, I believe it was a milk carton that

7    he had. It's been a while.

8        Q.    Did you actually see a milk container or

9    carton? If you don't recall --

10       A.    I don't recall, but I believe it was a milk

11   carton.

12       Q.    So that was not something that you collected?

13       A.    No, we were -- my personal concern at the time

14   was Inmate Guinn was in the interview room. He wasn't

15   going anywhere. And my concern was getting Officer

16   Shannon out of his clothes and making sure that Officer

17   Stevens' hand was seen by medical.

18            MS. VAN DYKE: Okay. Thank you very much.

19   Nothing else.

20            MS. WALKER: Thank you, Your Honor.

21                CROSS-EXAMINATION

22   BY MS. WALKER:

23       Q.    Good afternoon, Sergeant.

1        A.    Good afternoon.

2        Q.    I think you already indicated to the jury that

3    you were not present when the alleged feces throwing

4    occurred. That's correct, right?

5        A.    That's correct. It was thrown by the time I

6    got to the scene. That's why I was called.

7        Q.    And you were called because you are a

8    supervisor?

9        A.    That's correct.

10       Q.    Okay. And you responded to assist your

11   officers, right, that's your job?

12       A.    That's correct.

13       Q.    And you were concerned about Officer Shannon

14   because he was in a state of shock?

15       A.    Correct.

16       Q.    And by the way, Officer Shannon was relatively

17   new to the job at the time, correct?

18       A.    I believe he had approximately four or five

19   months.

20       Q.    Okay. And was -- let me take that back. You

21   did file an incident report in this case, correct?

22       A.    That's correct.

23       Q.    And you collected some evidence in this case?

113

1    A.  That's correct.
2    Q.  You indicated to the jury that you had
3    collected clothing, for example?
4    A.  That's correct.
5    Q.  You also took some pictures?
6    A.  That's correct.
7    Q.  And you said that you arrived after the
8    incident, like within a minute or so?
9    A.  That's correct, or less.
10   Q.  But after you arrived, you went and helped
11   Shannon and Stevens?
12   A.  Yes.
13   Q.  Okay. And about how long did that take, would
14   you say?
15   A.  Maybe five or 10 minutes just to get Officer
16   Shannon, and medical came down to see Officer Stevens.
17   Q.  Were you present when medical saw them?
18   A.  I was not present when medical saw Stevens. I
19   went with the captain that came down to move Inmate
20   Guinn to the isolation unit.
21   Q.  So you did that as well, right, after taking
22   care of Officer Shannon?
23   A.  That's correct.

114

1    Q.  And how long do you think that took you?
2    A.  Maybe five minutes.
3    Q.  Okay. So you'd say about 10 or 15 minutes that
4    all took you?
5    A.  Yes.
6    Q.  And then at some point you took pictures of the
7    scene, correct?
8    A.  That's correct.
9    Q.  Okay.
10       MS. WALKER:  And, Your Honor, may I retrieve
11   the photos?
12       THE COURT:  Yes, you may move freely about the
13   courtroom.
14       MS. WALKER:  Thank you.
15   BY MS. WALKER:
16   Q.  All right. Since the jury's already seen this,
17   I'd like to approach and show you, I guess they're
18   Exhibits 1 and 2 again and, specifically, Exhibit 2. I
19   think you talked to the prosecutor about this, but I
20   want to make sure that the jury understands. In the
21   middle of the photo there's a very light --
22   A.  The white -- the white color in the picture is

115

1    Q.  Okay. So that's not intended to be a
2    substance?
3    A.  No.
4    Q.  There's not a container of some kind?
5    A.  Right.
6    Q.  That's not contraband, to the best of your
7    knowledge?
8    A.  I believe it was the --
9    Q.  Light?
10   A.  The light from the floor or the light from the
11   ceiling hitting on the floor.
12   Q.  How often would you say these floors are
13   cleaned?
14   A.  They're cleaned every night. We have inmate
15   workers that come out every night and clean those
16   floors.
17   Q.  Okay. And then the second picture, I can't
18   really see it. What is supposed to be the feces?
19   A.  The feces is on the wall to the -- what would
20   be the left of the door on the wall here and on the
21   floor by the door. There's actually a lot of it by the
22   door, the door track, under the door track, and the
23   walls are splattered.

116

1    Q.  Now, would the wall have been -- let's say I'm
2    between -- would you be between the wall and the fence
3    if you were walking down the --
4    A.  Yes, the officer would have been on the right
5    side of Inmate Guinn. Inmate Guinn would have been
6    closest to the wall. And our officer, Shannon, was next
7    to the cage. I'm sorry. Inmate Hill would have been
8    closest to the wall. Inmate Guinn would have been in
9    the yard.
10   Q.  All right. So Officer Shannon and Officer
11   Stevens were closest to the yard, to the best of your
12   knowledge?
13   A.  That's correct.
14   Q.  From what you understood. And Mr. Hill was to
15   the left?
16   A.  To the left, on the side of the wall.
17   Q.  Of the officer. And it's on the left-hand side
18   that the feces hit the wall?
19   A.  Yes.
20   Q.  So it would have been more to Mr. Hill's left?
21   A.  It would have been -- it would have had to go
22   past our officer to get to Inmate Hill.

117

1  wall, correct?

2      A.  Yes.

3      Q.  You also indicated that the -- that Officer

4  Stevens was bandaged up at the nurse's station or by the

5  nurse?

6      A.  Correct.

7      Q.  He received a band-aid, correct?

8      A.  I don't recall what they put on him.

9      Q.  Okay.  Do you have a copy of your incident

10  report with you?

11      A.  Yes, I do.

12      Q.  Okay.  Could you take that out and take a look

13  at it?  You indicated in your report -- well, first of

14  all, in your report do you mention that you can see, and

15  you can take your time to look at this, a container

16  being involved at all?

17      A.  No, the only evidence that I listed was clothes

18  and pictures.

19      Q.  Okay.  Thank you.

20          And near the top of the report you do point out

21  that when you were -- well, first of all, this report

22  was done as part of an investigation or, excuse me, as

23  part of a procedure that the Department of Corrections

118

1  uses any time there's an incident?

2      A.  That's correct.  Any time we have an incident

3  or an inmate's going to receive disciplinary action, we

4  do.  Everybody that's involved in the incident does an

5  incident report.

6      Q.  Okay.  So not just criminal instances are

7  documented?

8      A.  No, an incident report can be for anything.

9      Q.  And this incident report helped you in

10  internally discipling Mr. Guinn?

11      A.  There's an incident report done and then

12  there's a disciplinary report done.  The disciplinary

13  report is forwarded to the hearing officer.  The hearing

14  officer does the discipline from that report and the

15  incident reports that are written.

16      Q.  So to the best of your knowledge, Mr. Guinn was

17  disciplined?

18      A.  As far as I know.  He went to isolation and

19  then from there --

20      Q.  Do you know how long he was there?

21      A.  More than likely 15 days at least.

22      Q.  Now, you also indicated near the top of the

23  report, like the sentence second I believe it is, that

119

1  you learned from Officer Stevens in your investigation

2  that Mr. Guinn had thrown the feces at Mr. Hill.  Is

3  that correct?  And there is more after that.

4      A.  That is what Officer Stevens told me.

5      Q.  Okay.  But he also goes onto tell you that he

6  missed Inmate Guinn and that it had hit both of the

7  officers, correct?

8      A.  That's what Officer Stevens told me, that he

9  did not hit Hill.  He hit both him and Shannon.

10      Q.  But he didn't come into you and say, This

11  inmate came and threw feces at me; he was honest in

12  telling you what he thought happened?

13      A.  Yes.

14      Q.  You don't think he was dishonest, do you?

15      A.  No.

16      Q.  Now, you indicated that you took some pictures

17  and that you bagged up the clothes.  And the clothes,

18  you wouldn't know what happened to them after Rispoli

19  got to them, right?

20      A.  Once I give them to Staff Lieutenant Rispoli,

21  they're out of my hands.  I have nothing else further to

22  do with the property as far as evidence goes.  What

23  should have happened was it went to the hearing officer

120

1  until the hearing took place just in case he needed the

2  evidence as -- for the hearing that he would have had

3  with Inmate Guinn.

4      Q.  Okay.  Now, the -- you took some pictures.  You

5  took pictures of the feces on the ground and on the

6  wall, right?  And you took a photo, which the jury has

7  seen, of the little cut that he has on his hand,

8  correct?

9      A.  That's correct.

10      Q.  Did you take any pictures of the officers with

11  the feces on them and their clothes?

12      A.  No, all we wanted to do is get Officer Shannon

13  out of his clothes.

14      Q.  You wanted to get him out of it.

15          And you didn't -- so you didn't actually see

16  the incident, correct?

17      A.  I did not see the incident.

18      Q.  And did you see Officer Stevens cuffing

19  Mr. Guinn when he put him back in his cell?

20      A.  Officer Guinn -- Inmate Guinn was in the

21  interview room when I arrived.

22      Q.  Okay.  So you didn't see that.  You also

23  indicated to the jury that there were inmates that were

125

1    Q.   So he would have been put in isolation without
2    a hearing?
3    A.   **Yes, they're put in -- on administrative**
4    **transfer in the beginning.**
5    Q.   Okay.
6    A.   **And then if -- if the hearing officer warrants**
7    **15 days isolation, then that time is credited to that --**
8    **to that charge.**
9    Q.   Okay. You indicated that Mr. Hill was put in
10   the shower as a precautionary measure?
11   A.   **Yes.**
12   Q.   Do you have any idea where he was headed before
13   this incident occurred?
14   A.   **He was actually going to the shower.**
15   Q.   Okay. So he was already going there?
16   A.   **Yes.**
17   **MS. WALKER: Nothing further.**
18   **MS. VAN DYKE: Your Honor, nothing further of**
19   **this witness.**
20   **THE COURT: You may step down.**
21   THE WITNESS: Thank you.
22   THE COURT: Do you have another witness?
23   MS. VAN DYKE: May we approach, Your Honor?

126

1    THE COURT: Yes.
2    (Whereupon, the following sidebar conference
3    was held.)
4    MS. VAN DYKE: At this point the State probably
5    may decide to close its case-in-chief. I would like
6    some time to do that, to think about whether or not I'm
7    going to do that at this point. Also, I think probably
8    a couple of issues have come up that I think I need to
9    address before I can make that decision, and I don't
10   know if we can hopefully in the time we have left
11   address that with Your Honor. I don't know if it would
12   be a good time to dismiss the jury.
13   THE COURT: All right. We'll dismiss the jury
14   for the day.
15   MS. VAN DYKE: Thank you.
16   (Sidebar conference was concluded.)
17   THE COURT: Ladies and gentlemen, we have a few
18   issues that we need to address and so you are going to
19   be dismissed for the day. We will reconvene tomorrow
20   morning at 10 o'clock. The bailiff will instruct you
21   where and when to go.
22   Again, please keep an open mind. Try as best

127

1    case one way or another. Avoid contact with anyone in
2    this room. And, also, do not discuss this case with
3    anyone, even among yourselves. Do not discuss this case
4    with anyone.
5    All right. Have a good evening.
6    (Whereupon, jury leaves the room at 4:14 p.m.)
7    THE COURT: I'm prepared at this time to
8    address the issue of whether or not these incident
9    reports are going to be admitted. Is that an
10   appropriate first order of business?
11   MS. VAN DYKE: Sure, Your Honor.
12   THE COURT: I'd like to ask counsel whether or
13   not Department of Corrections officers are considered
14   law enforcement personnel.
15   MS. WALKER: They are, Your Honor. I concede
16   that.
17   THE COURT: Well, if that is the case, then
18   even though these are reports, they don't fall within
19   the exception of 803(8) because the following are not
20   within the exception to the hearsay rule: investigative
21   reports by police or other law enforcement personnel.
22   Is it your argument these are not investigative reports?
23   MS. WALKER: That is correct, Your Honor. To

128

1    me, the way I read that is that it would be an
2    investigative report for the purpose of the criminal
3    case. In this particular case, that wasn't -- that
4    wasn't what the purpose was they filled that out. They
5    filled it out as part of an incident report, whether
6    administratively or criminally. And it just so happens
7    that the State has it. They clearly weren't going to
8    use it in their case as investigative material. So I
9    believe that it wouldn't be -- wouldn't fall into that
10   category.
11   THE COURT: Well, let's assume it doesn't.
12   It's still an out-of-court statement offered to prove
13   the truth of the matter asserted. So which exception do
14   you think it falls under again?
15   MS. WALKER: Records regularly -- kept in the
16   regular course of business, Your Honor. They testified
17   that these are records that they actually authored
18   themselves that they use as part of administrative
19   procedures that are kept as part of the DCC records.
20   THE COURT: Does the State have a position?
21   MS. VAN DYKE: Your Honor, these are, in
22   essence, investigative reports. It's basically what --

1 IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

2 IN AND FOR NEW CASTLE COUNTY

3

STATE OF DELAWARE,    ID No. 0411013992

4 Plaintiff,

5 v.

6 TYRONE L. GUINN,

7 Defendant.

8

9 BEFORE: HONORABLE MARY M. JOHNSTON, J.

10 and jury

11 APPEARANCES:

12

CARI VAN DYKE, ESQ.

13 Deputy Attorney General
for the State

14

NICOLE WALKER, ESQ.

15 for the Defendant

16 TRIAL TRANSCRIPT

17 MAY 20, 2005

18

19 JEANNE CAHILL, RMR, CRR
SUPERIOR COURT OFFICIAL REPORTERS

20 500 King Street - Wilmington, Delaware 19801
(302) 255-0561

21
22
23

---

3

1 MS. WALKER: Well, Your Honor, if she relies

2 solely on that, they either have to believe that he

3 intended to hit that officer to find him guilty of

4 that, or he's not guilty at all, so there would be

5 no offensive touching at all.

6 THE COURT: So you're not asking for that?

7 MS. VAN DYKE: You still have to prove

8 intent on an offensive touching, so it's not a

9 lesser-included.

10 I'm sorry this couldn't be decided

11 yesterday.

12 THE COURT: That's all right. It was

13 certainly interesting for me to research it,

14 anyway.

15 MS. VAN DYKE: I think it's going to have

16 the Legislature rolling.

17 MS. WALKER: They're probably down there

18 right now. That's what I was afraid of.

19 THE COURT: It is interesting. And it is an

20 issue of first impression. I do think that it's

21 pretty clear. You cannot use transferred intent to

22 escalate and add a new element to a charge. I

23 think that's pretty clear.

---

2

1 May 20, 2005
Courtroom No. 8E

2 9:45 a.m.

3 PRESENT:

4 As noted.

5 - - - - -

6

7 THE COURT: Good morning.

8 Over last evening I'm sure you've all

9 thought about these issues, as I have. I also

10 looked for a pattern instruction on transferred

11 intent, and was unable to find one. I have drafted

12 something, should that end up being appropriate.

13 MS. VAN DYKE: Your Honor, the State is not

14 going to seek a transferred intent instruction.

15 THE COURT: All right.

16 MS. VAN DYKE: That kind of closes that

17 issue.

18 THE COURT: All right. So you're going to

19 rely on the proof of the intent to assault the law

20 enforcement officers?

21 MS. VAN DYKE: Yes.

22 THE COURT: And what about the defense

23 asking for any --

---

4

1 MS. WALKER: This is kind of backward.

2 Usually, the State is trying to get transferred

3 intent.

4 MS. VAN DYKE: I know.

5 THE COURT: Was there anything else about

6 these instructions that we need to go over?

7 MS. VAN DYKE: Actually, my first name is

8 spelled wrong.

9 THE COURT: How is it spelled?

10 MS. VAN DYKE: It's C-A-R-I. Not the

11 typical spelling.

12 MS. WALKER: The Court already indicated the

13 "Office of the Public Defender" is coming out.

14 THE COURT: Yes.

15 MS. WALKER: The only other thing that I

16 noted is whether defendant's election to testify

17 goes in. And if we could, after the State rests,

18 which I believe they're going to do, and after we

19 have arguments with regard to -- I'd like to put on

20 the record officially my motions for judgment of

21 acquittal, if I could have an opportunity to talk

22 to my client one last time.

23 THE COURT: Normally what I do is put it in

13

1  Court.
2     Your Honor, I'd like to deal with the first
3  two counts, which I think would be based on the
4  same conduct. The State has to establish a prima
5  facie case that my client intentionally hit a
6  Correctional officer and intended to hit a
7  Correctional officer with the feces.
8     There is no argument that there was feces
9  involved here. At this point, I think they may
10  have established a prima facie case that my client
11  is the one that threw it, even though nobody saw
12  it. I think that the jury could infer that he was
13  the only one there; that he hit them.
14     However, the only testimony with respect to
15  intent that was elicited was that he, my client,
16  intended to hit Mr. Hill and not the Corrections
17  officer. None of them -- No evidence was placed on
18  the record that he intended to hit the Corrections
19  officer. It's not there.
20     Even if we don't -- the jury doesn't accept
21  their conclusions that Miss Van Dyke is going to
22  say, that's all it was, was a conclusory statement
23  by the CO's, if they take that out, then there is

14

1  nothing, there is no intent.
2     For all we know, my client could have been
3  in there just throwing the feces, not knowing
4  anybody was going to be coming up the walkway as
5  they were walking down.
6     No intent has been established at all or
7  presented to the Court with respect to those two
8  charges. So I clearly think that they haven't even
9  put forth a prima facie case with respect to that
10  element of the offense.
11     Now, on the third count, Your Honor, the
12  State has to establish a prima facie case that it
13  was my client's conscious object to cause physical
14  injury to the officer, Corrections officer.
15     Again, the only evidence that was presented
16  is the testimony of Officer Stevens that when he
17  went to take the cuffs off of my client, he pulled
18  away. And that's how -- and he hung onto the cuffs
19  because he was doing his job.
20     He didn't indicate my client pulled away
21  because he was trying to get away from the
22  officers. He didn't to testify that. In fact, he

15

1  with them at all. And in fact, they said he
2  cooperated in getting cuffed. However, he didn't
3  cooperate in being unhandcuffed.
4     The officer also testified, Your Honor, that
5  when they put them in the cell to uncuff them, they
6  are turned away from them, and they uncuff the one,
7  which is what he said happened here, and they turn
8  around and uncuff the other.
9     For all we know, Your Honor, that's all that
10  happened, and he pulled away in that respect.
11  Because nothing was presented that there was intent
12  on his part to pull in, to shake the handcuffs as a
13  weapon, to, you know, go in and get some other
14  weapon and try to hurt the officer.
15     So again, Your Honor, in both cases, this
16  comes down to intent. And in both cases, all three
17  cases, I should say, the State has failed to
18  present any evidence, any evidence, of intent by my
19  client to either strike Corrections officers or to
20  hurt or cause physical injury to an officer.
21     Therefore, Your Honor, I'm asking for a
22  judgment of acquittal on all three charges.
23     MS. VAN DYKE: Your Honor, the State would

16

1  request that you deny that motion. The standard of
2  review the Court must consider is the evidence at
3  this point must be viewed in the light most
4  favorable to the State.
5     The State presented evidence of the two
6  alleged victims in this case, Correctional Officer
7  Shannon and Correctional Officer Stevens.
8     As far as the defendant being the person
9  that committed the crimes, he's the only person in
10  the Yard 2. There is evidence that he was seen
11  holding a container, and there was feces all over
12  the fence of the yard in which he was contained.
13     As far as intent to hit the Correctional
14  officers, that intent can be inferred, and that is
15  a decision for the jury to grapple with.
16     Based upon the surrounding circumstances,
17  the close proximity that the victims were to the
18  defendant's recreation yard, the fact that Ernest
19  Hill, his alleged intended victim, is next to them
20  and he is not the closest person to the recreation
21  yard, this was a calculated plan, obviously.
22     This was something he had to think about

17

1  it intentionally at the victims. So the State does
2  believe that there is an inference that can be
3  drawn by the jury.
4       And as to Count III, it is the defendant's
5  actions that caused the injury. It is clear from
6  Officer Stevens' testimony that the defendant's
7  sudden movement caused him concern for safety, and
8  that he needed to make sure those cuffs were back
9  on the inmate. The inmate continued to struggle,
10  and that resulted in the injury.
11      Given all that, Your Honor, the State
12  believes at this point, if the Court views the
13  evidence in the light most favorable to the State,
14  the motion should be denied.
15      Thank you.
16      MS. WALKER: May I respond?
17      THE COURT: Yes.
18      MS. WALKER: With respect to Miss Van Dyke's
19  statement that the evidence has to be viewed in the
20  light most favorable to the State, she is
21  absolutely right, but they have to present evidence
22  for it to be viewed in the light most favorable to
23  that, and they haven't done that.

18

1       The intent in this case is specific intent
2  to hit a Corrections officer.
3       The sudden movement, there was no testimony
4  by the officer that he made a sudden movement and
5  that's what caused his cut. And everything he
6  testified to, it was because my client pulled away.
7  We have no idea why he pulled away. Nothing was
8  put into evidence regarding intent.
9       She also indicated it was planned and
10  calculated by my client to gather up his feces and
11  hit the officer. It may have been calculated and
12  planned to throw feces somewhere or do something
13  with it, but she has established no evidence of
14  calculation and planning.
15      THE COURT: All right. My ruling is as
16  follows: I do think that intent is a classic
17  factual question which should go to the jury. The
18  question is whether the State has established a
19  prima facie case.
20      With regard to Count III, the question is
21  whether it was the conscious object to cause
22  physical injury. There has been testimony that the

19

1  and there was testimony that his behavior deviated
2  from the normal procedure.
3       And, therefore, I think the State has
4  established a prima facie case for purposes of this
5  motion. So the motion for judgment of acquittal is
6  denied as to Count III.
7       With regard to Counts I and II, the question
8  is intent. I do agree that there is certainly a
9  question of fact raised even by the State's own
10  witnesses with regard to specific intent. However,
11  I think that under the circumstances, the intent
12  may be conferred from the proximity of the guards
13  to Inmate Hill and also the nature of the conduct
14  itself.
15      So there, the State has presented sufficient
16  evidence to survive a motion for judgment of
17  acquittal, so the motion is denied as to Counts I
18  and II as well.
19      Is there anything else we need to discuss
20  before we bring the jury in?
21      MS. VAN DYKE: No, Your Honor.
22      MS. WALKER: No, Your Honor.
23      THE COURT: All right.

20

1       MS. WALKER: Your Honor, there is one more
2  thing that I did want to address, and that is in
3  discussing with my client the evidence presented
4  and not presented by the State and explaining to
5  him his right to testify or not testify, he has
6  chosen not to testify in this case. Therefore, I
7  think the instruction as contained in the jury
8  instruction should remain.
9       THE COURT: All right. If the defendant
10  could please rise, we'll conduct that colloquy now.
11      MS. VAN DYKE: Your Honor, are they bringing
12  in the jury?
13      THE COURT: Yes. We'll have to stop them
14  when they get to the door.
15      Could the investigating officer tell them?
16      MS. WALKER: Thanks.
17      THE COURT: Mr. Guinn, your counsel has
18  informed the Court that it is your present
19  intention not to testify. Is that correct?
20      THE DEFENDANT: Yes, ma'am.
21      THE COURT: Within the last 24 hours, have
22  you taken any intoxicating substances, any drugs or

89

1   the nurse?

2       A.   I did. Yes, ma'am.

3       Q.   Is that standard procedure?

4       A.   Yes, ma'am, for injury with any contact with

5   inmates.

6       Q.   That makes sense.

7       A.   Yes, ma'am.

8       Q.   Do you recall telling the nurse that you got

9   your hand cut trying to put cuffs on an inmate?

10      A.   Trying to put them on him? No.

11      Q.   Would a more accurate statement be I got my

12  hand cut trying to uncuff an inmate?

13      A.   Somewhere in between there, in between the two,

14  yes, ma'am.

15      Q.   Okay. So if that was put in a nurse's report,

16  that would be inaccurate?

17      A.   What? What would be inaccurate?

18      Q.   If it says I got my hand cut trying to put

19  cuffs on an inmate, that would be inaccurate?

20      A.   I don't recall if she even asked, to be honest

21  with you.

22      Q.   Okay. Did she make -- excuse me. Do you

23  recall discussing with her the fact that you had feces

90

1   on you?

2       A.   No, ma'am.

3       Q.   Okay. But you indicated to the jury that you

4   had an open wound. Is that correct?

5       A.   Yes, ma'am.

6       Q.   And that there was -- the -- to the best of

7   your knowledge, it was on your pant leg, correct?

8       A.   Yes, ma'am.

9       Q.   But it had splattered different places,

10  correct?

11      A.   Yes, ma'am.

12      Q.   And when you testified earlier that they put

13  antibiotic on you and patched you up, they gave you a

14  band-aid, correct?

15      A.   Yeah, that's it.

16      Q.   And you were able to return to work that time?

17      A.   That evening.

18      Q.   In fact, you worked overtime?

19      A.   Yeah, that was my overtime shift.

20      Q.   That was your overtime.

21      A.   Kind of wish I didn't now, though.

22      Q.   Okay. And the incident report that you filled

91

1   respect to disciplinary actions that occur at prison?

2       A.   Any incident, ma'am.

3       Q.   Any incident?

4       A.   Yes, ma'am.

5       Q.   So not just criminal matters?

6       A.   No.

7       Q.   And that's -- have you been taught that that's

8   the standard procedure?

9       A.   For any incident?

10      Q.   Yes.

11      A.   Yes, ma'am.

12      Q.   Okay. And what happens after you write up the

13  incident report?

14      A.   You refer it to your supervisor.

15      Q.   And do you turn it into them?

16      A.   It's done through a computer. You refer it to

17  them, and I don't know where it goes from there, to be

18  honest with you.

19      Q.   And you receive a copy of it?

20      A.   Most of the time. Yes, ma'am.

21      Q.   You have a copy of this one?

22      A.   Yes, ma'am. I do.

23      Q.   Okay. And you've had a chance to look it over

92

1   and it's truthful and accurate, to the best of your

2   knowledge?

3       A.   Yes, ma'am.

4       Q.   And to the best of your knowledge, that is

5   exactly what you wrote in your report?

6       A.   Yes, ma'am.

7       Q.   Okay.

8            MS. WALKER: Your Honor, at this time I move to

9   enter the incident report into evidence.

10           THE COURT: I'll hold that decision in

11  abeyance.

12           MS. WALKER: Thank you.

13  BY MS. WALKER:

14      Q.   One more thing. You also indicated that

15  Mr. Guinn took a container and threw the liquid,

16  correct?

17      A.   Yes, ma'am.

18      Q.   You didn't say peanut butter jug?

19      A.   No, ma'am. It was similar to a peanut butter

20  jug is what it looked like.

21      Q.   You didn't go get it to examine exactly what it

22  was?

69

1    Q.   Did you actually see Tyrone Guinn throw

2    anything?

3    A.   No, ma'am.

4    Q.   Okay. Do you recall whether or not Ernest

5    Hill, the other inmate that you were escorting, whether

6    or not he had any feces/urine on him?

7    A.   I do not recall. I don't believe so.

8    Q.   How far away would you say Officer Shannon was

9    from the recreation yard?

10   A.   Well, on the walkway, I mean, there's only

11   maybe a space of four-feet wide to walk in between the

12   wall and the yard fence. So not far.

13   Q.   Okay. Do you recall seeing Inmate Guinn in the

14   yard?

15   A.   Yes, ma'am.

16   Q.   Okay. Do you remember seeing him at any

17   particular location at any time in the yard?

18   A.   All over it pretty much.

19   Q.   How about when you were escorting Ernest Hill,

20   did you take any particular -- pay any particular

21   attention to Tyrone Guinn at that point?

22   A.   Not until after the incident. I looked up, and

23   he was maybe three or four feet back from the fence.

70

1    Q.   Okay. Three or four feet back from the fence?

2    A.   Yes, ma'am.

3    Q.   Did he have anything in his hand?

4    A.   The container.

5    Q.   Could you tell the jury what your observations

6    were of Officer Shannon, like the way he responded to

7    what happened?

8    A.   Mr. Shannon was -- he was in complete shock. I

9    mean, he was just in complete shock, probably denial

10   that he had feces and urine on his face and running --

11   dripping down his ears and hair.

12   Q.   And what about you, what were you thinking at

13   that time?

14   A.   I felt bad for him.

15   Q.   What was the thought that you had at that point

16   once you realized the incident occurred? What did you

17   do next?

18   A.   I told Mr. Shannon to take Mr. Hill to the

19   shower, secured him in there, and then I told Mr. Guinn

20   to cuff up. And he did.

21   Q.   What does "cuff up" mean?

22   A.   Back up to the flap on the yard, place his

23   hands out of it, and let me handcuff him so that we can

71

1    take him out of the yard.

2    Q.   Okay. And he was compliant in doing that?

3    A.   Yes, he was compliant.

4    Q.   And meanwhile, where is Officer Shannon?

5    A.   Shannon, Officer Shannon, had come back to me.

6    Q.   Okay. So he had to actually go on his own with

7    Inmate Hill?

8    A.   It was only a couple more steps from where they

9    were at.

10   Q.   Okay. And was there any necessity as to why

11   you needed to cuff Tyrone Guinn at that time?

12   A.   It's just better to take care of a situation

13   right away if you can.

14   Q.   Why is that?

15   A.   This way he doesn't have time to do something

16   else.

17   Q.   You said that he was compliant in cuffing him.

18   What was your next step at that point?

19   A.   To take him out of the yard and place him back

20   in his cell.

21   Q.   And where is his cell in relation to the yard?

22   A.   Straight across, pretty much.

23   Q.   And was Officer Shannon back with you?

72

1    A.   Yes, ma'am.

2    Q.   Okay. And how -- could you explain to the jury

3    the process that you went through to get Tyrone Guinn

4    back into his cell?

5    A.   I cuffed him at the flap in the yard. Removed

6    him from the yard. Brought him back to his cell. When

7    we bring him back to his cell, went to take one cuff

8    off, and he pulled away. As soon as he pulled away,

9    just restrained him. Took him down. Put the cuff back

10   on his right wrist, and then removed him from the cell,

11   and brought him out to the interview room.

12   Q.   You said "he." When you started to take the

13   cuff off of his one hand, is this occurring while he's

14   inside his cell?

15   A.   Yes, ma'am. He's at the cell, and the door's

16   maybe open this much.

17   Q.   Okay. You're able to get in through that door?

18   A.   I am? Yes, ma'am.

19   Q.   With Tyrone Guinn?

20   A.   Yes, ma'am.

21   Q.   Okay. And you say he pulls away. Well, if

22   you're undoing the cuff, could you describe how he

23   pulled away?

61

1    Q. And what does the academy involve? Is that the
2    two- to three-month program?
3    A. Yes, ma'am.
4    Q. Okay. Nothing in addition to that?
5    A. No, ma'am.
6    Q. And do you recall what shift you were working
7    on June 30th, 2004?
8    A. 4 to 12 as overtime.
9    Q. What do you mean by "overtime"?
10    A. I went in at 4, the 30th, and got off at 8
11    o'clock in the morning the next day.
12    Q. Okay. So you worked more than 4 to 12?
13    A. Yes, ma'am.
14    Q. The normal shift would be from 4 to 12 and then
15    you worked beyond that?
16    A. Yes, ma'am.
17    Q. Okay. Is the 4 to 12 shift usually your shift
18    or do you have -- does --
19    A. I was on the shift for two and a half years,
20    and then I've done my past two years on 12 to 8.
21    Q. 12 midnight to 8 a.m. is your current shift?
22    A. Yes, ma'am.
23    Q. Okay. And what were your responsibilities for

62

1    the shift on June 30th, 2004, the 4 to 12?
2    A. Feeding, recreation, I believe laundry that
3    day, then just routine checks.
4    Q. Okay. Did you have a partner on that shift?
5    A. Yes, I did.
6    Q. And who was that?
7    A. Officer Shannon.
8    Q. Now, is he your regular partner or --
9    A. No, ma'am.
10    Q. Okay. Do you have a regular partner or do you
11    always switch up?
12    A. Normally switch up.
13    Q. Do you recall how many cells -- I had a diagram
14    earlier. You can probably still see it on that wall
15    over there. How many inmate cells are in the tiers?
16    A. Total of 25.
17    Q. Okay.
18    A. 12 downstairs, 12 upstairs, and also a handicap
19    cell.
20    Q. Okay. Could you tell us on -- where was --
21    well, do you know Tyrone Guinn?
22    A. Do I know him? Yes, I know him.

63

1    A. Just daily routine. I mean, I know him as an
2    inmate.
3    Q. You know him as an inmate?
4    A. Yes, ma'am.
5    Q. Okay. And could you tell us on June 30, 2004,
6    where he was located, where his cell was located amongst
7    the tiers?
8    A. I believe he was lower 9.
9    Q. Okay. So the lower level?
10    A. Yes, ma'am.
11    Q. The first level?
12    A. Yes, ma'am.
13    Q. And that's the same level that has 12 cells?
14    A. Yes, ma'am.
15    Q. And you believe he was in 9?
16    A. Yes, ma'am.
17    Q. And do you recall any point in time when Tyrone
18    Guinn on that specific date was removed from Cell 9?
19    A. Yes, he was removed from the cell and put into
20    Yard 2.
21    Q. Okay. And is Yard 2 directly across from Cell
22    9?
23    A. Yes, ma'am.

64

1    Q. Do you recall, and if you don't recall, you
2    don't need to guess, but do you recall the approximate
3    time of when he was removed from his Cell No. 9 to Yard
4    No. 2?
5    A. I'd say approximately between 4:30 p.m. and
6    5 p.m.
7    Q. And how did you go about removing him from his
8    cell into the yard?
9    A. He's handcuffed at his cell door, then taken
10    into the yard. The yard door is shut. Then he's
11    uncuffed from inside the yard.
12    Q. Okay. And how do you accomplish the uncuffing
13    in the yard?
14    A. There's a flap on the yard fence where he
15    places his hands, and you take the cuffs off.
16    Q. Okay. And do you recall on that specific date
17    whether or not Inmate Tyrone Guinn had any personal
18    items with him?
19    A. Not that I knew of at the time.
20    Q. Okay. You don't recall whether or not he was
21    carrying anything in addition to just his regular
22    uniform, had his uniform on and that was it, that was

21

1    Q.   Are you permitted to carry any weapons of any

2    sort?

3    A.   **No.**

4    Q.   Do you have any means of protection that you're

5    able to carry?

6    A.   **Well, other than Capstone and just handcuffs,**

7    **but at the time I -- it wasn't issued for everyone to**

8    **have caps at the time. So I didn't have caps on.**

9    Q.   So on June 30th you did not have caps on?

10   A.   **No.**

11   Q.   So, first, could you please explain to the jury

12   what that is?

13   A.   **Capstones, in other words, it's pepper spray, a**

14   **strong liquid made from -- it's like a direct solution**

15   **from cayenne peppers that can easily just swell up the**

16   **face or, you know, kind of -- well, basically blind a**

17   **person. You know what I'm saying? Not too much to**

18   **where they lose sight, but it's very irritating.**

19   Q.   Okay. Were you aware of whether or not Officer

20   Neil Stevens had --

21   A.   **No, he didn't.**

22   Q.   He did not either. Okay.

23        Was there any particular routine as far as what

22

1    inmates came out at a certain time on that date, what

2    inmates went to the yard?

3    A.   **Yes, it's a rotation that we have. Sometimes**

4    **inmates start out -- it usually starts out two cells.**

5    **Usually we'll start at usually 1 or 2 for that day or**

6    **the next day we'll start at 3 or 4. So if we have,**

7    **like, if we're having recreation for cells 7 to 12,**

8    **we'll start out either with 7, 8, and then tomorrow will**

9    **probably be 8 or 9 or tomorrow will be 10 or 11. So for**

10   **that day it was 9 and 10.**

11   Q.   Okay. And what -- you said you do know Tyrone

12   Guinn?

13   A.   **Uh-hmm.**

14   Q.   How do you know him?

15   A.   **I just know him as an inmate that was housed**

16   **that I used to work regularly over in Building 19.**

17   Q.   Okay. And do you recall having contact with

18   him as an inmate on June 30th, 2004?

19   A.   **Other than the incident, it was merely just**

20   **business. Anything -- like if I asked for did he want**

21   **to go out for recreation or showers or anything like**

22   **that, nothing more than that.**

23   Q.   Do you recall whether or not he did go to

23

1    recreation?

2    A.   **Yes, he did.**

3    Q.   Okay. Do you recall around what time?

4    A.   **Probably around --**

5    Q.   If you can't remember --

6    A.   **I can't remember. I don't want to.**

7    Q.   But it was during your shift which was from 4

8    to midnight?

9    A.   **Yes, yes.**

10   Q.   Okay. And do you see Tyrone Guinn in the

11   courtroom today?

12   A.   **Yes.**

13   Q.   Could you please point him out, describe an

14   article of clothing that he's wearing?

15   A.   **He's sitting right there with the grayish-green**

16   **kind of shirt on.**

17        MS. VAN DYKE: Okay. Let the record reflect

18   the witness has identified the defendant, Tyrone Guinn.

19   BY MS. VAN DYKE:

20   Q.   Okay. And when you took him out for recreation

21   on June 30th, 2004, what procedure did you follow and

22   who did you follow it with?

23   A.   **Just basically when me and Officer Stevens took**

24

1    him out, had him handcuffed behind. He had his usual,

2    had the bag with his clothing, all the clothes,

3    whatever, and that was about it. And we took him to

4    Yard 2, placed him in there.

5    Q.   So when you went out to recreation -- do you

6    recall whether he went to Recreation Yard 1 or 2 on the

7    interior?

8    A.   **Yard 2 on the interior.**

9    Q.   Yard 2 on the interior?

10   A.   **Yes.**

11   Q.   So that's right near, right across from his

12   cell?

13   A.   **Yes.**

14   Q.   And you said he had a bag of clothing?

15   A.   **Yes.**

16   Q.   Okay. Could you please describe what the

17   typical uniform or jumpsuit is for a prison or inmate?

18   A.   **Well, usually it's an orange jumpsuit that they**

19   **like to wear, orange sweatshirts, because it usually**

20   **gets cold on a tier. Sometimes they get a combination**

21   **of both. And they carry out their boxers, socks,**

22   **t-shirt, or whatever, and probably their shower shoes,**

23   **shower slippers**

121

1  used to clean up the mess, correct?

2      A.  That is correct.

3      Q.  So no officer had to get down on their hands

4  and knees to clean this up, right?

5      A.  We had to be on the tier with them when they

6  were doing it, especially because we had two out at the

7  same time. I was on one side of one and Sergeant

8  Percheck was on --

9      Q.  Okay. So you were supervising them?

10     A.  That's correct.

11     Q.  But you weren't cleaning the floor?

12     A.  We weren't swinging the mops, but we were

13  there.

14     Q.  They were issued what you said is part of the

15  standard operating procedures, biohazard suits?

16     A.  That's correct.

17     Q.  And you keep these on hand because these types

18  of incidents occur, correct?

19     A.  Correct.

20         MS. WALKER: I have nothing further.

21         MS. VAN DYKE: May I? Thank you.

22                REDIRECT EXAMINATION

23  BY MS. VAN DYKE:

122

1      Q.  You said you believe the defendant, Tyrone

2  Guinn, spent 15 days in isolation?

3      A.  I believe that's typically -- when an incident

4  happens, the inmate will go for 15 days of isolation,

5  unless for some reason he gets out early, and I wouldn't

6  have that.

7      Q.  Is there any other type of punishment that can

8  be imposed?

9      A.  They can receive loss of all privileges, but it

10  doesn't happen until the actual hearing officer conducts

11  his hearing. They can receive loss of all privileges,

12  confinement to quarters, and/or more time in isolation

13  according to what the offense was.

14     Q.  Okay. And are these like administrative

15  write-ups? I mean, how are these -- how do they get to

16  the penalty or the punishment?

17     A.  When an inmate violates one of the rules that

18  are in the housing rules, if they're written up for it,

19  the write-up then goes to the hearing officer. The

20  hearing officer hears it with the inmate there. The

21  inmate gives their side of the story. The officer gives

22  their side of the story from the report, or if the

23  inmate elects to confront their accuser, they have a

123

1  hearing together. And then the hearing officer directs

2  whatever discipline is going to be put in place, whether

3  it be isolation, loss of all privileges, or confinement

4  to quarters.

5      Q.  And do you have any specific knowledge in

6  relation to Tyrone Guinn whether or not he had a

7  hearing?

8      A.  No.

9      Q.  Okay. And not just speaking about Tyrone

10  Guinn, but in other cases when there's a write-up or

11  administrative hearing, is it also that on occasions

12  that criminal charges are also filed?

13     A.  That's correct.

14     Q.  Who makes the decision to file criminal

15  charges?

16     A.  I assume internal affairs or higher to the

17  warden.

18     Q.  But with respect to this case, you're not sure

19  who decided?

20     A.  I'm not sure who decided.

21     Q.  Okay. Now, did you personally observe -- you

22  observed the feces on Officer Shannon?

23     A.  Yes.

124

1      Q.  Did you also observe it on Officer Stevens?

2      A.  On the back of his right leg.

3      Q.  Okay. And when you collected the uniforms, you

4  noticed there was feces on the uniforms?

5      A.  That's correct.

6      Q.  Was there a lot?

7      A.  Yes.

8      Q.  Were you familiar with whether or not Ernest

9  Hill was struck with feces?

10     A.  We checked Ernest Hill. Ernest Hill had no

11  feces that we could see. We still took the precaution

12  just in case and placed him in the shower so that he

13  could take a shower.

14         MS. VAN DYKE: Nothing further. Thank you.

15         MS. WALKER: Couple questions, Your Honor.

16                CROSS-EXAMINATION

17  BY MS. WALKER:

18     Q.  You indicated to the prosecutor and to me that

19  you believe Mr. Guinn received 15 days in isolation?

20     A.  Yes.

21     Q.  But you're not aware whether or not he

22  eventually had a hearing, correct?

23     A.  Not that I recall.

313 , 2005

N. M. WALKER

TYRONE L. GUINN,
Defendant Below,
Appellant,
v.

T. J. DONOVAN.

STATE OF DELAWARE,
Plaintiff Below,
Appellee.

DF $ 00.00

2005

| 1 | Jul 13 | Notice of appeal from the convictions and sentence imposed on 07/01/05 in the Superior Court in and for New Castle County, by Judge Johnston, in Cr. A. No. IN04111482, I.D. #0411013992, with designation of transcript. (served by hand 7/13/05) (mfm) |
|---|---|---|
| 2 | Jul 13 | Directions to court reporter of proceedings below to be transcribed pursuant to Rule 9(e) by appellant. (service shown on court reporter by hand 7/13/05) (mfm) |
| 3 | Jul 15 | Letter dated 7/15/05 from Chief Deputy Clerk to Kathleen Feldman, transcript is due to be filed by 8/22/05. (dlw) |
| 4 | Jul 15 | Letter dated 7/15/05 from Chief Deputy Clerk to Nicole M. Walker, Esquire, requesting a copy of Judge Johnston's 7/1/05 sentencing order be filed to be attached to the notice of appeal upon her receipt. (dlw) |
| 5 | Jul 25 | Letter dated 7/22/05 from Nicole M. Walker, Assistant Public Defender to Clerk, enclosing sentencing order being appealed. (service shown) (rdd). |
| 6 | Aug 24 | Court reporter's final transcript log entry: Prothonotary received 8/17/05. (eas) |
| 7 | Aug 24 | Letter dated 8/24/05 from Senior Court Clerk to Prothonotary, record is due to be filed by 8/31/05. (eas) |
| 8 | Aug 25 | Record w/ transcript. (eas) |
| 9 | Aug 25 | Brief schedule issued. (opening brief due 9/26/05) (eas) |
| 10 | Sep 23 | Appellant's opening brief and appendix. (served by hand 9/23/05) (mjd) |
| 11 | Oct 18 | Affidavit requesting to proceed pro se pursuant to Rule 26(d)(iii). (no service shown) (mjd) |

$B - /$

12.  Oct  18          Directions to court reporter of proceedings below to be
                      transcribed pursuant to Rule 9(e) by appellant.
                      (no service shown on the court reporter) (mjd)

13  Oct  20           Letter dated 10/20/05 from Chief Deputy Clerk to Nicole
                      M. Walker, Esquire, forwarding the appellant's
                      documents filed on 10/17/05. (dlw)

14  Oct  26           Brief delinquency notice dated 10/26/05 from Clerk to
                      appellee. (clh)

15  Oct  26           Motion for leave to file answering brief out of time by
                      appellee. (served by hand 10/26/05)(mjd)

16  Oct  28           Additional transcript to be made part of the record.
                      (eas)

17  Nov  01           Order dated 10/31/05 by Steele, C.J., appellee's
                      answering brief is due 11/23/05 (afb).

18  Nov  18           Letter dated 11/15/05 from Tyrone Guinn to Court,
                      regarding his appeal. (mjd)

19  Nov  22           Appellee's answering brief. (served by hand 11/22/05)
                      (mjd)

20  Nov  22           Letter dated 11/22/05 from Assistant Clerk to Nicole M.
                      Walker, Esq., forwarding Mr. Guinn's 11/15/05 letter
                      for appropriate disposition (afb).

21  Nov  22           Notice dated 11-22-05 from Clerk to counsel, the case
                      will be submitted for decision on briefs as of 12-21-05
                      (clh)(MTS,CB,JBJ)

22  Dec  05           Appellant's reply brief. (served by hand 12/5/05) (mfm)
    2006

23  Feb  14           Letter dated 2/14/06 from Tyrone Guinn to Clerk,
                      regarding his appeal. (eas)

24  Feb  14           Letter dated 2/14/06 from Senior Court Clerk to Nicole
                      Walker, Esquire, forwarding Mr. Guinn's letter for
                      appropriate disposition. (eas)

25  Feb  22           Letter dated 2/18/06 from Tyrone Guinn to Clerk,
                      regarding his appeal. (eas)

26  Feb  22           Letter dated 2/22/06 from Senior Court Clerk to Nicole
                      Walker, Esquire, forwarding Mr. Guinn's letter for
                      appropriate disposition. (eas)

27  Feb  28           Order dated 2/28/06 by Steele, C.J., AFFIRMED.
                      (MTS,CB,JBJ) (eas)

28  Mar  13           Letter dated 3/1/06 from Tyrone Guinn to Clerk,
                      inquiring as to the status of his appeal. (docket
                      sent) (eas)

B-2

29   Mar  16     Record and mandate to clerk of court below. Case Closed
                 (afb).

30   Mar  20     Letter dated 3/11/06 from appellant to Clerk requesting
                 a copy of the docket sheet and the name of his counsel
                 (sent) (afb).

B-3

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE

    VS.

TYRONE L GUINN

Alias: See attached list of alias names.

DOB: 11/12/1984
SBI: 00375731

CASE NUMBER:                CRIMINAL ACTION NUMBER:
0411013992                  IN04-11-1483
                              ASSLT DET FACIL(F)

### SENTENCE ORDER

NOW THIS 1ST DAY OF JULY, 2005, IT IS THE ORDER OF THE
COURT THAT:

The defendant is adjudged guilty of the offense(s) charged.
The defendant is to pay the costs of prosecution and all
statutory surcharges.

AS TO IN04-11-1483- : TIS
ASSLT DET FACIL

Effective July 1, 2005 the defendant is sentenced
as follows:

- The defendant is placed in the custody of the Department
of Correction for 8 year(s) at supervision level 5 with
credit for 4 month(s) 12 day(s) previously served

- Suspended after serving 3 year(s)  at supervision level 5

- For 3 year(s) supervision level 4 **HALFWAY HOUSE**

- Suspended after serving 1 year(s)  at supervision level
4 **HALFWAY HOUSE**

- For 2 year(s)  supervision level 3

- Hold at supervision level 5
**APPROVED ORDER**   1    August  4, 2005 12:08

**STATE OF DELAWARE**
        **VS.**
**TYRONE L GUINN**
**DOB: 11/12/1984**
**SBI: 00375731**

- Until space is available at supervision level 4 <u>HALFWAY</u>
<u>HOUSE</u>

The first 1 years   of this sentence is a mandatory term
of incarceration pursant to DE11 1254FD .

*C* -2



## PUBLIC DEFENDER OF THE STATE OF DELAWARE
### ELBERT N. CARVEL STATE OFFICE BUILDING
820 NORTH FRENCH STREET, THIRD FLOOR
P.O. BOX 8911
WILMINGTON, DELAWARE 19801

LAWRENCE M. SULLIVAN
PUBLIC DEFENDER

NICOLE M. WALKER
ASSISTANT PUBLIC DEFENDER

ANGELO FALASCA
CHIEF DEPUTY

TELEPHONE
(302) 577-5121

March 16, 2005

Mr. Tyrone Guinn
SBI#375731
H.R.Y.C.I.
1301 East 12th Street
Wilmington, DE 19809

   RE: State v. Tyrone Guinn
     ID#0411013992

Dear Mr. Guinn:

  This responds to your letter to our office dated March 4,
2005.

  First, I have to say that I am puzzled by your concerns. I
have already met with you by video on two occasions to discuss
your case. Also, you did give me names of potential witnesses.
As I told you I would do, I had those witnesses interviewed by my
investigator and have issued the appropriate subpoenas. At no
time did I say this would not help your case. I simply explained
the different ways the jury may perceive this defense.

  Second, we have discussed, during our video conferences, the
discovery that I have received by the State on your behalf. You
did not request this information from me on any occasion we have
met. However, to address your concerns, I have enclosed it for
you.

  Finally, you may not have received my direct phone number
simply because you had previously been assigned to another
attorney and, thus, it was an oversight. You will find my number

at the top of this letter.  However, you have sent me letters, which I reviewed immediately upon receipt.

If you have any further concerns regarding your case, as usual, I will be happy to discuss them.

Very truly, yours,

Nicole M. Walker
Assistant Public Defender

MMW:dab

D-2

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| TYRONE GUINN, | § |
| | § No. 228, 2007 |
| Defendant Below- | § |
| Appellant, | § |
| | § Court Below—Superior Court |
| v. | § of the State of Delaware |
| | § in and for New Castle County |
| STATE OF DELAWARE, | § Cr. ID No. 0411013992 |
| | § |
| Plaintiff Below- | § |
| Appellee. | § |

Submitted: August 10, 2007
Decided: September 21, 2007

Before **HOLLAND**, **BERGER** and **JACOBS**, Justices

### ORDER

This 21st day of September 2007, upon consideration of the briefs on appeal and the record below, it appears to the Court that:

(1)    The defendant-appellant, Tyrone Guinn, filed an appeal from the Superior Court's April 17, 2007 order denying his motion for postconviction relief pursuant to Superior Court Criminal Rule 61. We find no merit to the appeal. Accordingly, we AFFIRM.

(2)    In May 2005, Guinn was found guilty by a Superior Court jury of Assault in a Detention Facility. He was sentenced to 8 years of Level V incarceration, to be suspended after 3 years for 4 years of decreasing



NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

BY THE COURT:

/s/ Carolyn Berger
Justice